*Decision will be entered for the respondent.*

R. GEORGE LAVERNE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 37760-84, 5543-85,     Filed April 24, 1990.
33773-85.

*Larry K. Hercules* and *Edward G. Lavery,* for the petitioners.

*George E. Gasper* and *Stephen C. Coen,* for the respondent.

SWIFT, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows:

---

[1]Cases of the following petitioners have been consolidated for purposes of this proceeding: Curt K. Cowles, docket No. 5543-85, and Gary M. and DeAnne Gustin, docket No. 33773-85.

*R. George LaVerne*

| | | Interest and additions to tax[2] | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6621(c) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1982 | $7,904.20 | * | $395.20 | ** | $790.40 |

*Curt K. Cowles*

| | | Interest and additions to tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6621(c) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1979 | $7,685.50 | - - - | - - - | - - - | - - - |
| 1982 | $8,802.00 | * | $440.10 | ** | $880.20 |

*Gary M. and DeAnne Gustin*

| | | Interest and additions to tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6621(c) | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1979 | $570.00 | - - - | - - - | - - - | - - - | - - - |
| 1982 | 14,537.00 | * | $277 | $727 | ** | $1,454 |

\* 120% of the interest due on the deficiency.
\*\* 50% of the interest due on the deficiency.

Petitioners are individuals who invested in limited partnerships known as Barbados No. 1 and Barbados No. 4. The primary issue for decision is whether the transactions entered into between the individual investors and the partnerships had economic substance or whether they were sham transactions designed to produce excessive and erroneous tax deductions for the investors. These consolidated cases are test cases for other investors who also invested in Barbados No. 1 and Barbados No. 4 and in the other related partnerships.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner R. George LaVerne resided in Irvine, California, when he filed his petition. Petitioner Curt K. Cowles resided in Denver, Colorado, when he filed his petition. Petitioners Gary M. Gustin and DeAnne Gustin resided in Boise, Idaho, when they filed their petition.

In 1982, James M. Clark, on behalf of Bajan Resorts, Inc. (Bajan Resorts), purchased property in the Caribbean on which to build a resort hotel. The property was located in the Parish of St. Philip, on the island of Barbados in the

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

West Indies. Clark entered into a contract to purchase the property for approximately $1,750,000.

Bajan Resorts was a real estate development company, incorporated in Delaware on June 17, 1980. Clark was the principal owner of Bajan Resorts. Prior to September of 1982, Bajan Resorts was known as Kilburn Vacation Homeshare, Inc., and it had developed a timeshare project in Park City, Utah, known as Kilburn Vacation Homeshares (the Kilburn project). The Federal income tax aspects of the Kilburn project have been the subject of other litigation in this Court. See *Ames v. Commissioner,* T.C. Memo. 1985-443, and *Ames v. Commissioner,* T.C. Memo. 1990-87.

As a prerequisite to financing the purchase by Bajan Resorts of the property in Barbados, the Central Bank of Barbados required that the property be nominally owned by a Barbados company. Clark, therefore, in October of 1982, formed a Barbados corporation known as Bajan Development Co., Ltd. (Bajan Development). Bajan Development was initially a wholly owned subsidiary of Bajan Resorts. Shortly thereafter, Bajan Resorts transferred the purchase contract for the property to Bajan Development.

Clark apparently contributed $50,000 to Bajan Development and, through his ownership interest in Bajan Resorts, Clark controlled Bajan Development. At some later date, Ezra Alleyne, a Barbadian attorney, purchased preferred stock in Bajan Development for approximately $1,250. The president of Bajan Development was Jan Oster, Clark's brother-in-law.

On October 27, 1982, Bajan Development unilaterally executed a document entitled Declaration of Covenants, Conditions and Restrictions for The Admiral Beach (declaration of covenants). In this document, Bajan Development stated its intention to build a large resort hotel on the property acquired in Barbados from Bajan Resorts. As indicated, the hotel was to be named The Admiral Beach.

Construction and subsequent management of The Admiral Beach was to be handled by The Admiral Beach Owners' Association (ABOA), a Delaware nonprofit corporation. ABOA was to perform its obligations through its wholly owned subsidiary, The Admiral Beach, Ltd. (The Admiral Beach Ltd.), a Barbados company, which was formed solely to

construct, develop, manage, and operate The Admiral Beach. ABOA and Admiral Beach Ltd. were controlled by Clark, who was at all relevant times a member of the board of directors of ABOA. Clark exercised control of ABOA and Admiral Beach Ltd. through his ownership of Bajan Development, which retained the majority of the memberships in ABOA, as described below.

According to the declaration of covenants of Bajan Development, ownership interests in the underlying real property that was purchased in Barbados by Bajan Resorts and that was transferred to Bajan Development, as well as ownership interests in the resort hotel to be built thereon, were to be divided into 31,200 "property interests," described as fractional undivided fee simple interests in common tenancy. Each property interest was to be accompanied by one membership in ABOA entitling the owner to occupy a one-bedroom suite at the resort hotel. In combination, a property interest and an ABOA membership apparently were intended to be similar to timeshare interests.

According to promotional materials, other documents, and testimony at trial, The Admiral Beach was to have up to 635 one-bedroom suites. It was anticipated that 600 suites would be required to accommodate the 31,200 ownership interests that were to be sold and that each ownership interest was to reflect the right to occupy one suite 1 week a year (600 $\times$ 52 = 31,200). Use of the additional 35 suites was to be made available as part of a sales-incentive program to individuals involved in promoting sales of the ownership interests.

Bajan Services, Inc. (Bajan Services) was a Delaware corporation formed by Clark in 1982 to function as the general partner of various limited partnerships to which ownership interests in The Admiral Beach and ABOA were to be sold. There were eventually nine limited partnerships, named Barbados No. 1 through Barbados No. 9 (the Barbados partnerships).

Bajan Services was wholly owned by the ABOA "pension fund." Clark allegedly created the ABOA pension fund for the benefit of the anticipated employees of The Admiral Beach. Clark selected Ezra Alleyne to be trustee of the

voting trust that purported to control the ABOA pension fund.

During the last few months of 1982, Barbados Nos. 1 through 6 were formed. Petitioner Cowles invested as a limited partner in Barbados No. 1, and petitioners Gustin and LaVerne invested as limited partners in Barbados No. 4. The structure of these two partnerships was identical in all significant respects.

Limited partnership units in each of the Barbados partnerships generally were sold to the limited-partner investors in groups of four.[3] Each group of four limited partnership units was sold with one "reservation privilege." The reservation privileges received by the limited partners represented rights similar to but in significant ways less than the rights represented by the property interests and memberships in ABOA that the limited partnerships themselves received. Four partnership units and the one reservation privilege associated therewith together were referred to as a "Sun Package." Each Sun Package received by an investor represented the definite right to spend 1 week at The Admiral Beach during its first year of operation. A reservation privilege did not give the limited-partner investors the definite right to spend a week at The Admiral Beach in any year other than the first year the hotel was completed.

In order to have the right to spend a week at The Admiral Beach in years after the year in which the hotel was completed, investors were required to purchase additional reservation privileges in each year. Bajan Services, however, was under no obligation to offer reservation privileges to investors in later years. Also, if additional reservation privileges were offered to investors in later years and if investors declined to purchase additional privileges, the investors' interests in the Barbados partnerships could be terminated entirely by the purchase by Bajan Services for a nominal amount of the investors' limited partnership units. The contractual documentation between

---

[3]Some limited partners purchased fewer than four partnership units. Petitioners Cowles and the Gustins each bought four, but petitioner LaVerne purchased only two units and his friend, Dominic Meo, purchased two. Together, LaVerne and Meo had one reservation privilege to share or divide between them.

the investors and the limited partnerships expressly states in this regard as follows:

[The investors] hereby represent and warrant that [they]:

\* \* \* \* \* \* \*

(i) understand that [they] have no obligation to buy the Reservation Privilege in any subsequent year and that BARBADOS has no obligation to offer or sell the Reservation Privilege in any subsequent year or at prices currently offered. You also understand that if BARBADOS offers to sell the Reservation Privilege to you and you choose not to buy, BARBADOS will then have the option to repurchase your Unit(s) for $250 per Unit, or such lesser amount as you have paid, for such Unit(s) as described in Article XI of the Agreement; \* \* \*

Investors also were told that in each year they held a reservation privilege, in addition to the specified 1-week use of a suite at The Admiral Beach, investors might be offered use of a suite at the hotel for additional weeks depending upon availability.

In general, for each Sun Package sold to investors, each of the Barbados partnerships (through Bajan Services as general partner) purchased from Bajan Development one property interest in The Admiral Beach and one membership in ABOA. Under the purchase agreements between the Barbados partnerships and Bajan Development, the stated purchase price for each combined property interest and ABOA membership purchased by a partnership was approximately $10,000, with a downpayment of approximately $5,000 and the balance, plus interest, to be reflected by deferred payments to be paid generally over 40 years. Apparently, however, because of the extended 40-year term of the deferred payments, the unusual schedule for the actual payments due on the deferred payment obligation, and the interest rate charged on the deferred payments (which interest rate is not disclosed in the record), the annual payments stated to be due from each of the Barbados partnerships with respect to each property interest purchased in the Admiral Beach in each of the years 2018 through 2022 (the last 5 years of the 40-year note) were approximately $65,000. There were no written promissory notes reflecting the deferred payment obligations of the partnerships.

More specifically, Barbados No. 1 agreed to pay $10,750, plus interest, for each property interest it purchased in The Admiral Beach, reflected by a downpayment of $4,450 and a deferred payment obligation of $6,300, plus interest, due over 40 years. The payments of principal and interest due on each deferred payment obligation of Barbados No. 1 were as follows:

*Barbados No. 1*

| | |
|---|---|
| July 1, 1983 | $1,825 |
| July 1, 1984 | 1,825 |
| July 1, 1985 | 1,825 |
| July 1, 1986 | 1,825 |
| 1987-2017 | - - - |
| July 1, 2018 | 64,280 |
| July 1, 2019 | 64,280 |
| July 1, 2020 | 64,280 |
| July 1, 2021 | 64,280 |
| July 1, 2022 | 64,280 |

Barbados No. 4 agreed to pay $10,750, plus interest, with respect to each property interest it purchased in The Admiral Beach, reflected by a downpayment of $4,412.50 and a deferred payment obligation of $6,337, plus interest, due over 37 years. The payments of principal and interest due on each deferred payment obligation of Barbados No. 4 were as follows:

*Barbados No. 4*

| | |
|---|---|
| July 1, 1983 | $1,825 |
| July 1, 1984 | 1,825 |
| July 1, 1985 | 1,825 |
| July 1, 1986 | 1,825 |
| 1987-2014 | - - - |
| July 1, 2015 | 73,160 |
| July 1, 2016 | 73,160 |
| July 1, 2017 | 73,160 |
| July 1, 2018 | 73,160 |
| July 1, 2019 | 73,160 |

Under the purchase agreements, any prepayments would be applied first to accrued interest, then to principal.

The deferred payment obligations of the Barbados partnerships were described as recourse as to the partnerships

themselves, but nonrecourse as to the general partner and nonrecourse as to the limited partners. On October 27, 1982, the purchase agreement between Barbados No. 1 and Bajan Development was executed. On December 30, 1982, the purchase agreement between Barbados No. 4 and Bajan Development was executed.

As security for the payment of amounts due under the partnerships' deferred payment obligations, the partnerships were to establish reserve funds to ensure that the payments due after 1986 would be made. The reserve funds theoretically could have been sufficient to make the scheduled payments due on the partnership deferred payment obligations had the reserve funds earned, in the case of Barbados No. 1, approximately a 13-percent annual rate of return, and in the case of Barbados No. 4, approximately a 14.5-percent annual rate of return. None of the partnership reserve funds was ever established.

Quite inconsistent with the above schedule of payments due from each partnership on each deferred payment obligation associated with the property interests purchased by the partnerships, interest expenses were to accrue on the principal amount of the deferred payment obligations under what the parties refer to as a modified Rule-of-78's method[4] in order to produce enormous interest deductions for the Barbados partnerships that would flow through to the individual investors in the partnerships. Under the modified Rule of 78's used by the Barbados partnerships the stated annual interest deductions that were to accrue by Barbados No. 1 and Barbados No. 4 *with respect to each property interest purchased* were as follows:

| Year | Barbados No. 1 | Barbados No. 4 |
|------|----------------|----------------|
| 1982 | $91,600 | $64,100 |
| 1983 | 73,300 | 51,350 |
| 1984 | 55,000 | 38,550 |

[4]The Rule of 78's, also known as the Sum of the Years Digits, is a method of allocating the interest and principal components of loan accruals and/or loan payments. The Rule of 78's results in the acceleration of interest accruals in the early years of a loan and (where it does not conform to the interest that would accrue under the economic-accrual method and where interest accruals under the Rule-of-78's method materially exceed the interest the taxpayer is required to pay each year under the payment schedule established by the parties to the loan), the Rule of 78's results in a material distortion of income in the case of long-term loans. Use of the Rule-of-78's method has been disallowed except in limited circumstances because of this distortive effect. *Prabel v. Commissioner,* 91 T.C. 1101 (1988) (Court reviewed), affd. 882 F.2d 820 (3d Cir. 1989).

| Year | Barbados No. 1 | Barbados No. 4 |
|---|---|---|
| 1985 | 36,600 | 25,600 |
| 1986 | 18,300 | 12,850 |
| 1987 | 1,400 | 4,850 |
| and each subsequent year until paid off | 1,400 | 4,850 |

In 1982, the purchase price of each Sun Package to individual limited partner investors in Barbados Nos. 1 and 4 was $8,000, $500 of which was designated as a capital contribution. In 1983, the Barbados No. 1 limited partners were required to make an additional $250 capital contribution, and the Barbados No. 4 limited partners were required to make an additional $500 capital contribution. The balance of $7,500 to be paid by each individual investor in 1982 was designated as payment for the reservation privilege to be available during the hotel's first year of operation (projected to be 1984).

As previously explained, if reservation privileges were offered in subsequent years and if an investor chose to purchase an additional reservation privilege, the investor would be required to pay the purchase price associated with the reservation privilege in the subsequent year, which price—as of 1982—was projected to be approximately $3,750 in 1983 and $4,250 in each of the years 1984, 1985, and 1986. The projected price of each reservation privilege dropped to approximately $500 in years after 1986. If a limited partner declined to purchase a reservation privilege in any year in which it was offered, the partnership was entitled, at its option, to repurchase the limited partner's units in the limited partnership at their original cost ($187.50 per unit for Barbados No. 1 and $250 per unit for Barbados No. 4).

Allegedly in order to avoid complying with U.S. securities regulations, Clark developed an unusual structure for and limitation on the individual limited partnership interests. He obtained several legal opinions to the effect that interests in the limited partnerships would not be regarded as securities if there was no potential for the limited partners to earn a pecuniary profit with respect to their investments. Thus, the limited partners were prohibited under the terms of the limited partnership agreements

from selling or transferring their partnership interests for a profit. The alleged benefit to be received by individual investors in the Barbados partnerships would be realized solely in the form of low-cost vacations at The Admiral Beach over a period of many years. However, as explained, there was no obligation on the part of ABOA, Bajan Services, Bajan Development, or any of the other related entities to offer reservation privileges to the investors in any year after the initial year of the hotel's operation.

Consistent with the "no-profit potential" of the investments, each limited partnership agreement provided that all items of income, gain, loss, deduction, and credit were to be allocated and distributed 99 percent to the limited partners and 1 percent to the general partner until such time as the limited partners realized a return of their capital contributions to the partnerships plus 95 percent of the cumulative amounts they paid for the Sun Packages. Thereafter, all partnership items were to be allocated 100 percent to the general partner. Apparently, under no circumstances short of dissolution or termination of the partnerships were any distributions of profits, gains, or capital to any of the limited partners to take place until the year 2037.

Another entity, Bajan Travel, Inc. (Bajan Travel), was incorporated in Utah on May 3, 1982, by John Eyre, Marvin Mills, Richard McLellend, and James Cox. Bajan Travel was formed to handle the marketing and sales of the Barbados partnership Sun Packages to individual investors. Bajan Travel was owned by the four individuals who created it, all of whom were directors of ABOA.

West Indian Resort Advisors (WIRA) was an alleged general partnership between Bajan Travel, Bajan Resorts, and Affiliated Development Corp. (ADC). On October 2, 1982, acting purportedly as president of the latter three entities, D. Bradley Eyre signed an alleged general partnership agreement forming WIRA. ADC was owned by the same four individuals who owned Bajan Travel. D. Bradley Eyre was the son of John Eyre and had no active role in the development of The Admiral Beach or the selling of partnership interests. WIRA maintained a post office box in St. Thomas, U.S. Virgin Islands.

WIRA had a know-how license agreement with Bajan Development dated December 30, 1982, under which WIRA was to license its trade secrets and intangible expertise to Bajan Development for use in developing and packaging the Barbados partnerships. Apparently, the primary purpose of this agreement was to facilitate the transfer of money out of Barbados and into the United States by circumventing Barbados foreign exchange rules and to avoid payment of Barbados income taxes. Under the know-how license agreement, WIRA was to receive $2,245 in "royalties" for each property interest sold by Bajan Development. Bajan Development was also to assign to WIRA the right to subsequent installment payments to be received from the Barbados partnerships with respect to property interests purchased.

For their sales and marketing efforts, individuals selling limited partnership interests in the Barbados partnerships received commissions totaling between 47 percent and 52 percent of amounts paid by investors for their Sun Packages. Sales personnel were also eligible to receive certain benefits in the form of ABOA memberships (essentially reservation privileges) if specified sales quotas were reached.

Sales brochures describing the Barbados partnerships featured lengthy discussions of the tax benefits of becoming limited partners. Three legal opinions concerning the many purported tax benefits of investing in the Barbados partnerships were made available to investors by promoters of the partnerships. The legal opinions acknowledge numerous potential tax problems with the investments.

Petitioners' expert witness, Kathleen Conroy, presented evidence of the value of a 1-week vacation at The Admiral Beach. She visited all first-class hotels in Barbados and obtained the rates for one-bedroom suites for the 1982-83 winter season. Seven hotels offered one-bedroom suites, ranging from $120 per night to $450 per night. For a 1-week stay the average cost was $1,442.

In October of 1984, construction of a hotel was completed on the Barbados property purchased by Bajan Development. The hotel, however, has only 16 one-bedroom suites, rather than the 635 originally projected for The Admiral Beach, and the hotel is called the Ginger Bay Beach Club.

In years subsequent to 1982, Bajan Services, Bajan Resorts, and Bajan Development all filed for protection from their creditors under Chapter 11 of the U.S. bankruptcy laws.

Petitioners Gustin and Cowles did not consult with any independent tax advisors before purchasing Sun Packages. They relied exclusively on the legal opinions supplied by the promoters, although Gustin did place a telephone call to an agent of the Internal Revenue Service. The agent with whom Gustin spoke was not familiar with the Barbados partnerships but suggested to Gustin that if the deal looked too good to be true it probably was.

Petitioner LaVerne, an attorney in general business practice, showed the legal opinions provided by the promoters to his personal tax advisor. His advisor apparently stated that, in his opinion, the Barbados partnerships appeared to be legitimate investments.

None of the petitioners conducted any background checks into the promoters or developers of the Barbados partnerships, nor did they evaluate other allegedly similar investments such as timeshares.

The following chart shows amounts as reported on the partnership returns of income (Forms 1065) filed by Barbados No. 1 and Barbados No. 4 for the year ending December 31, 1982, and the adjustments made by respondent on audit:

|  | Barbados No. 1 | | Barbados No. 4 | |
|---|---|---|---|---|
|  | As reported | As adjusted | As reported | As adjusted |
| Accrued interest | $20,976,400 (229 property interests × $91,600) | - - - | $11,730,300 (183 property interests × $64,100) | - - - |
| Gross receipts | 1,717,500 | $1,832,000 | 1,372,500 | $1,464,000 |
| Loss | 19,799,961 | - - - | 10,810,691 | - - - |

The $500 received from each limited partner as a capital contribution was not included in income by either partnership. On audit, respondent also included in the income of each partnership this $500 received from each partner.

For 1982, petitioners (as well as the other limited partners) reported large losses from their investments in

the Barbados partnerships. Respondent denied the losses and redetermined petitioners' income from the Barbados partnerships, as follows:

|  | Cowles | Gustins | LaVerne |
|---|---|---|---|
| Losses reported on tax returns | ($86,463) | ($59,075) | ($29,537) |
| Income determined by respondent | 504 | 5,470 | 2,735 |
| Increases in taxable income | 86,967 | 64,545 | 32,272 |

Petitioner Cowles also filed Form 1045, Application for Tentative Refund, to claim a net operating loss carryback of $45,033 to 1979. This carryback resulted entirely from the Barbados No. 1 loss claimed by Cowles for 1982, and was denied by respondent.

Petitioners Gustin filed their return for 1982 after the due date of April 15, 1983, without an extension or reasonable cause for delay.

## OPINION

### Economic Substance and Sham Transaction

Transactions that have no economic substance, that have no realistic possibility of making a profit, and that have no legitimate business purpose will be considered shams and will not be recognized for Federal income tax purposes. *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-584 (1978); *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 91 (4th Cir. 1985), affg. on this issue 81 T.C. 184, 209 (1983). See *Shriver v. Commissioner,* 899 F.2d 724 (8th Cir., Mar. 28, 1990), affg. a Memorandum Opinion of this Court; *James v. Commissioner,* 899 F.2d 905 (10th Cir. 1990), affg. 87 T.C. 905 (1986); *Sochin v. Commissioner,* 843 F.2d 351, 354 (9th Cir. 1988), cert. denied 488 U.S. 824 (1988), affg. 85 T.C. 968 (1985). An inquiry into the economic substance and business purpose of transactions is inherently factual. *Larsen v. Commissioner,* 89 T.C. 1229, 1252 (1987), on appeal (9th Cir., Dec. 12, 1988), and cases cited. Petitioners bear the burden of proof on this issue. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).

Petitioners admit that it was not possible for them to make a pecuniary profit on their investments in the Barbados partnerships. The investment structure ensured that the only funds the limited partners could hope to receive were the return of the nominal amounts denominated capital contributions, plus 95 percent of amounts paid for the reservation privileges. These funds were to be returned, if at all, without interest and as long as 55 years after they were paid. All partnership profits, after return of investor capital and 95 percent of the payments for the reservation privileges, were to be distributed to Bajan Services, the general partner of each partnership. The limited partners did not acquire any interest in the underlying real estate or assets acquired by the partnerships. There was no possibility that the limited partners could profit from any appreciation of the property.

The only potential value (other than tax benefits) individual investors obtained from their investments was the reservation privilege, the second component of the Sun Package. The alleged value of the reservation privilege was the potential ability to take a vacation every year at The Admiral Beach. As explained, however, Bajan Services was under no obligation to offer additional reservation privileges to the limited partners after the first year of the hotel's operation. The only definite right acquired with the purchase of a reservation privilege was a one-time 1-week vacation in the first year The Admiral Beach was opened.

It is clear that investors in the Barbados partnerships, including petitioners herein, could not and did not have any realistic, legitimate nontax financial or business purpose for agreeing to pay $8,000 in 1982 for a 1-week vacation in a hotel not scheduled to be completed until 1984. The right to a one-time vacation was worth, according to petitioners' own expert witness, less than $1,500.

The promotional and sales material emphasized the unusually large tax deductions purportedly available to investors—as much as $91,600 for 1982. Despite petitioners' allegations to the contrary, it is clear that investments in Barbados Nos. 1 and 4 did not have economic substance and were sham transactions, and that the objective of the investments was the production, at the partnership level, of

enormous and illusory tax deductions and losses that would be passed on to the limited partners.

The losses claimed by petitioners on their 1982 Federal income tax returns as a result of investments in the Barbados partnerships are not allowed. Because these transactions are shams and are to be disregarded for Federal income tax purposes, respondent concedes that no income therefrom can be attributed to petitioners.[5]

Other arguments made by petitioners have been considered and are without merit. With regard, however, to the partnerships' use, for tax purposes, of a modified Rule-of-78's interest accrual computation, we make an alternative holding.

We recently considered the validity, for tax purposes, of the use by investors in long-term real estate investments of the Rule of 78's to calculate and accrue interest deductions. See *Levy v. Commissioner*, 92 T.C. 1360, 1366-1369 (1989); *Prabel v. Commissioner*, 91 T.C. 1101, 1111-1120 (1988) (Court reviewed), affd. 882 F.2d 820 (3d Cir. 1989). As we stated in *Levy:*

where interest accruals calculated under the Rule-of-78's method materially exceed the amount of interest that would be accrued under the economic-accrual method and where the interest accruals under the Rule-of-78's method materially exceed the amount of interest the taxpayer is required each year to pay under the payment schedule established in the loan transaction, respondent has the authority under section 446(b) to remedy the resulting distortion in the taxpayer's taxable income. [*Levy v. Commissioner, supra* at 1368.]

On the authority of *Prabel v. Commissioner, supra,* and *Levy v. Commissioner, supra,* and for the reasons set forth therein, we sustain respondent's disallowance, for tax purposes, of the use by the Barbados partnerships of a modified Rule-of-78's method for accruing interest deductions associated with the 40-year and the 37-year deferred payment obligations.

*Interest and Additions to Tax*

Respondent determined the applicability of the increased interest rate of section 6621(c), formerly section 6621(d), to

---

[5]Respondent's concession on the income issue, conditioned on respondent's prevailing on the sham issue, was made in a conference call with the Court on Mar. 19, 1990.

the tax deficiencies determined with respect to petitioners' investments in the Barbados partnerships on the ground that petitioners' tax deficiencies constituted substantial underpayments attributable to tax-motivated transactions. Section 6621(c)(3)(A)(v) includes in the definition of tax-motivated transactions "any sham or fraudulent transaction." Because we have found the transactions at issue in this case to be shams, section 6621(c) applies.

Respondent also determined the additions to tax of section 6653(a)(1) and (2). These additions to tax apply where any part of a tax deficiency is due to negligence. Negligence, for this purpose, is the failure to use due care or to do what a reasonable and ordinarily prudent person would have done under the circumstances. *Neely v. Commissioner*, 85 T.C. 934, 947 (1985). Respondent's determination is presumptively correct and the burden is on petitioners to prove they were not negligent. *Betson v. Commissioner*, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court; *Luman v. Commissioner*, 79 T.C. 846, 860-861 (1982); *Bixby v. Commissioner*, 58 T.C. 757, 791 (1972).

The failure of petitioners to look beyond the promotional materials supplied by the salespeople or to consult independent advisors on so complex a matter as the proposed investments in the Barbados partnerships is unreasonable and is not in keeping with the standard of the ordinarily prudent person. Petitioner LaVerne, though he consulted an independent tax advisor who suggested that the investment would generate allowable tax deductions, also fails to meet his burden of proof. There is no evidence in the record that petitioners conducted any research into the timeshare market in Barbados or elsewhere, or that they conducted any background checks of the promoters or developers of the Barbados partnerships.

On its face, the Barbados partnership investments should have raised serious questions in the minds of ordinarily prudent investors. It is simply unreasonable to expect that by investing $8,000 in late 1982, investors would be entitled to deduct in excess of $90,000 in interest accruals for 1982. Such obviously suspect tax claims raise a duty of inquiry on the part of potential investors. Petitioners have not

satisfied us that they in good faith investigated the underlying viability, financial structure, and economics of the proposed investments in the Barbados partnerships. Petitioners are liable for the additions to tax under section 6653(a)(1) and (2).

In the notices of deficiency, respondent also determined additions to tax under section 6661(a) at the rate of 10 percent of the amount of the entire underpayment of tax. In his answers, respondent moved to increase the rate applicable under section 6661(a) to 25 percent, which motions are granted. See *Pallottini v. Commissioner*, 90 T.C. 498, 501-502 (1988) (Court reviewed).

Section 6661(a) imposes an addition to tax if there is a substantial underpayment of income tax in any given year. An understatement is defined as the excess of the amount of tax required to be shown on the tax return over the amount of tax actually shown on the return as filed less any rebates. A substantial understatement is one that exceeds the greater of either 10 percent of the tax required to be shown on the return or $5,000.

In calculating understatements under section 6661(a), items for which there is substantial authority or with respect to which all relevant facts were adequately disclosed in or attached to the tax return are not to be considered. Sec. 6661(b)(2)(B). However, in the case of a "tax shelter" even full disclosure in the tax return will not reduce this addition to tax. Sec. 6661(b)(2)(C)(i). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership or other entity or investment plan or arrangement or any other plan or arrangement the principal purpose of which is the avoidance or evasion of Federal income tax.

Here, the understatements in tax are substantial. The transactions at issue were obvious tax-shelter sham transactions, lacking in economic substance, the only significant purpose of which was to reduce the limited partners' Federal income tax liabilities.

Petitioners have offered no authority, nor are we aware of any, that could be considered substantial to support the losses here at issue. *Antonides v. Commissioner*, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990), on appeal (2d Cir., Feb. 17, 1989); section 1.6661-3(b), Income Tax

Regs. The three legal opinions solicited by the promoters of the Barbados partnerships discuss at length the tax benefits that purportedly would become available to the investors. They fail, however, to adequately address the controlling facts and legal authority, and they do not contain or constitute substantial authority for the deductions and losses claimed. The additions to tax under section 6661 are sustained.

*Decisions will be entered under Rule 155.*