T.C. Memo. 1995-581


UNITED STATES TAX COURT


PAUL L. AND DORIS J. TRIEMSTRA, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14254-89, 17923-89,   Filed December 6, 1995.
            18126-89.


<u>Paul L. Triemstra</u>, pro se, for petitioners in docket

No. 14254-89.

<u>Sidney L. Cohn</u>, pro se, for petitioners in docket

No. 17923-89.

<u>William G. Christopher</u>, for petitioners in docket

No. 18126-89.

<u>Mary P. Hamilton</u>, <u>Paul Colleran</u>, and <u>William T. Hayes</u>, for

respondent.

---

[1]    Cases of the following petitioners are consolidated
herewith:  Sidney L. Cohn and Beverly M. Cohn, docket No. 17923-
89; and Jeffrey R. Kravitz and Fran Kravitz, docket No. 18126-89.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These consolidated cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[2]  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  These cases are part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The facts of the underlying transaction in these cases are substantially identical to those in the Provizer case.

In notices of deficiency, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes for the taxable year ending December 31, 1981:

| | | | Additions to Tax | | |
| Docket No. | Petitioners | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
|---|---|---|---|---|---|
| 14254-89 | Triemstra | $13,929 | $696 | 1 | $4,179 |
| 17923-89 | Cohn | 14,728 | 736 | 1 | 4,418 |
| 18126-89 | Kravitz | 10,506 | 525 | 1 | 3,152 |

[1]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

In the notices of deficiency, respondent also determined that interest on deficiencies accruing after December 31, 1984, would

[2]    All section references are to the Internal Revenue Code, in effect for the year in issue, unless otherwise stated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

be calculated at 120 percent of the statutory rate under section 6621(c).[3]

Petitioners have conceded that they are liable for the deficiencies in tax, the section 6659 additions to tax, and the section 6621(c) additional interest as determined in respondent's notices of deficiency.

The sole issue for decision is whether petitioners are liable for additions to tax for 1981 for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated by this reference.

Petitioners Jeffrey and Fran Kravitz resided in Birmingham, Michigan, when their petition was filed. Petitioners Paul and Doris Triemstra resided in Troy, Michigan, when their petition

---

[3] The notices of deficiency refer to sec. 6621(d). This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744, and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89, sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant cases. For simplicity, we will refer to this section as sec. 6621(c). The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1994, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

was filed. Petitioners Sidney and Beverly Cohn resided in Farmington Hills, Michigan, when their petition was filed.

During 1981, petitioners Jeffrey Kravitz (Kravitz), Paul Triemstra (Triemstra), and Sidney Cohn (Cohn) were all affiliated with Bromberg, Robinson, Shapero, Cohn & Burgoyne, P.C. (Bromberg, Robinson), a 10 to 14 member law firm in Southfield, Michigan. Kravitz, Triemstra, and Cohn were also general partners in Bellvine Associates (Bellvine) during 1981. Bellvine was a four-man partnership formed to invest in Northeast Resource Recovery Associates (Northeast), a limited partnership. The fourth partner in Bellvine was Michael C. Hechtman (Hechtman), another attorney at Bromberg, Robinson. In 1981, Bellvine acquired a 2.605250-percent interest in Northeast. The underlying deficiencies in these cases resulted from respondent's disallowance of claimed losses and tax credits that were passed through Northeast and Bellvine to petitioners.

The facts of the underlying transaction in these cases are substantially identical to those in Provizer v. Commissioner, supra, and may be summarized as follows. In 1981, Packaging Industries, Inc. (PI), manufactured and sold seven Sentinel expanded polyethylene (EPE) recyclers to ECI Corp. for $6,867,000 ($981,000 each), of which $530,000 was paid in cash. ECI Corp., in turn, resold the recyclers to F & G Corp. for $8,138,667 ($1,162,666 each), of which $615,000 was paid in cash. F & G Corp. then leased the recyclers to Northeast, which licensed the

recyclers to FMEC Corp., which sublicensed them back to PI.  All of the monthly payments required among the entities in the above transactions offset each other.  These transactions were done simultaneously.  We refer to these transactions collectively as the Northeast transaction.

In Provizer v. Commissioner, supra, we examined the Clearwater transaction.  In the Clearwater transaction, PI sold six EPE recyclers to ECI Corp. for $981,000 each.  ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each.  F & G leased the recyclers to a limited partnership, Clearwater, which licensed them to FMEC, which sublicensed them to PI.  The transaction involved herein differs in two respects:  (1) Seven Sentinel EPE recyclers were sold and leased rather than six, and (2) Northeast, rather than Clearwater, leased the recyclers from F & G and then licensed them to FMEC.  Northeast is thus like Clearwater, occupying the same link in the transactional chain.  In addition, the Sentinel EPE recyclers considered in these cases are the same type of machines considered in the Provizer case.  The fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap.  The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

The following interests were all acquired during 1981. Bellvine acquired a 2.605250-percent limited partnership interest in Northeast. Triemstra acquired a 26.668-percent interest in Bellvine for $6,000. Kravitz acquired a 20-percent interest in Bellvine for $4,500. Cohn acquired a 26.667-percent interest in Bellvine for $6,000. As a result of the passthrough from Northeast and Bellvine, petitioners claimed the following operating losses and credits:

| Petitioner | Operating Loss | Investment Tax Credit | Business Energy Credit |
|------------|----------------|-----------------------|------------------------|
| Triemstra | $5,424 | $5,654 | $5,654 |
| Cohn | 5,424 | 5,654 | 5,654 |
| Kravitz | 4,068 | 4,241 | 4,241 |

Respondent disallowed petitioners' claimed deductions and credits related to Bellvine's investment in Northeast.

Petitioners are all well-educated, practicing attorneys with experience in business and investing. Kravitz received a B.A. degree with a major in political science from Miami University in Oxford, Ohio, in 1965. In 1968, he received a J.D. degree from the University of Michigan Law School. Kravitz developed a specialty in real estate law. At the time of trial, Kravitz was a partner in a firm having approximately 240 attorneys.

In 1965 Triemstra received a B.A. degree from Calvin College with a double major in mathematics and economics. From 1965 to 1970, Triemstra worked for the Chrysler Corporation (Chrysler). At Chrysler he received training in finance, worked as a budget analyst, and then worked at the corporate staff level as a credit

analyst in the treasury department, and then in the budget department. During his years at Chrysler, Triemstra also attended Wayne State University Law School at night and completed his J.D. course requirements in the summer of 1969. After receiving his J.D., Triemstra briefly worked part-time and attended MBA courses at the University of Michigan. In 1971 Triemstra began practicing law full-time at the firm of Fisher, Franklin & Fuller and stopped taking MBA courses. Triemstra left that firm in 1974 and joined Bromberg, Robinson where he became a partner in 1979. He became a shareholder after that firm merged with Shapero & Cohn and converted to a professional corporation. At the time of trial, Triemstra was practicing law with the 140-member Butzel Long law firm.

Cohn attended Wayne State University from 1937 to 1939. He then entered the Detroit College of Law and attended classes at night while working in a law office during his first 1-1/2 years of law school. In 1941 Cohn worked long hours at a defense plant while still attending law school at night. From 1942 to 1943 Cohn worked in the legal division of the Federal Office of Price Administration. Upon graduating from law school in 1943, Cohn obtained a commission in the United States Navy and served on active duty for 2-1/2 years. During the course of his legal career, Cohn has syndicated numerous real estate transactions, many of which were mobile home parks and a number of which were tax shelters. From 1970 to 1981 he syndicated 16 limited

partnerships. During 1981 Cohn held investment interests in as many as 32 limited partnerships. Cohn is proud of his success as a syndicator and investor, and he also is proud of the results achieved for those who have invested in his syndications.

Two of Kravitz' clients, Claude Hessee (Hessee) and Les Garrapee (Garrapee), were in the business of acquiring and managing apartment complexes. Hessee and Garrapee would locate apartment complexes to purchase, enter into purchase agreements, and then find general partners to arrange the equity investment in the projects. In his representation of Hessee and Garrapee, Kravitz negotiated the purchase agreements for properties and was responsible for additional matters including review of title, the survey, financing of the transaction, and handling the closing.

In 1978 Hessee located an equity investor for a $5,000,000 apartment complex project in Indianapolis, Indiana. The investor was Richard Roberts (Roberts), a businessman from New York City. Kravitz represented Hessee in negotiating the purchase agreement, and Kravitz represented the partnership that bought the property. Roberts' attorneys prepared the offering memorandum for the partnership. Kravitz reviewed the offering memorandum to assure that it correctly reflected the real estate transaction. The entire transaction closed in roughly 4 to 6 months. During that time, Kravitz dealt with Roberts and his business associate, Raymond Grant (Grant). Kravitz served in the same capacity in the acquisition of two more apartment complexes in which either

Roberts or Grant was the general partner. Kravitz did not invest in any of these real estate transactions.

Sometime in August 1981, Roberts informed Kravitz of the Northeast transaction. Roberts was the general partner in a number of limited partnerships, including Northeast, which leased Sentinel EPE recyclers. Roberts also was a 9-percent shareholder in F & G. Roberts explained the Northeast transaction and its tax benefits to Kravitz. Kravitz knew that Roberts' background was in banking, and Kravitz had no indication that Roberts had any knowledge or experience in plastics, plastics recycling, or machinery. Kravitz read the entire Northeast offering memorandum. Roberts told Kravitz that he had visited PI, had seen a recycler in operation, and believed Northeast was a good investment.

Kravitz introduced Northeast to Cohn, Triemstra, and Hechtman and told them of his discussions with Roberts. Kravitz also discussed the Northeast offering memorandum with Garrapee, who had experience with Roberts and Grant. Garrapee was a certified public accountant (C.P.A.) and was responsible for the financial aspects of the apartment complex projects, including preparation of the financial reports as well as the pro forma financial information included in the various offering memoranda. Garrapee told Kravitz that he and his partners were going to invest in Northeast. Kravitz did not know whether Garrapee had any background in plastics or plastics recycling.

Kravitz also discussed the Northeast transaction and the Sentinel EPE recycler with Grant. Grant was the president and 100-percent owner of the stock of ECI. Kravitz knew that Grant was an attorney who had worked in the securities industry, but he had no reason to believe that Grant had any knowledge or experience with respect to plastics, plastics recycling, or machinery. Grant told Kravitz that he had spoken with people at PI and that these people at PI had told him that the Sentinel EPE recyclers were priced as if being sold to an independent third party. Kravitz did not know how the Sentinel EPE recycler worked or why it was presented as unique. He did not investigate the Sentinel EPE recycler. Kravitz understood from the offering memorandum that the Sentinel EPE recycler was not patented, and he did not conduct a patent search. He never saw a Sentinel EPE recycler or asked if he could see one. Kravitz never investigated or visited any end-user company.

Triemstra learned of the Northeast transaction from Kravitz. Triemstra read the Northeast offering memorandum over the course of several evenings. Triemstra previously had seen other offering memoranda. During 1981 Triemstra also invested in a gas exploration venture and directed the investment of $5,000 of his retirement plan into a mobile home park. Triemstra discussed the Northeast transaction with Kravitz, Cohn, and Hechtman. Kravitz informed Triemstra of his discussions with Roberts and Grant.

Triemstra had no education or experience in the recycling or plastics fields.

Triemstra did not investigate PI. He was unaware of the prevailing price of polyethylene pellets at the time, and he did not investigate the price of virgin pellets. Triemstra never saw a Sentinel EPE recycler or asked if he could see one. He never visited an end-user. Triemstra was unaware of any competing plastics recyclers and did not investigate the matter.

Cohn learned about the Northeast transaction from Kravitz. Cohn was provided a copy of the Northeast offering memorandum and remembers having read the draft legal opinion and the reports of the evaluators included in the appendices thereto. Cohn concluded there were no comparable machines solely on the basis of his reading of the Northeast offering memorandum. Before investing in Northeast, Cohn contacted Alvin Shapiro (Shapiro), a C.P.A. who had prepared Cohn's tax returns for many years. Shapiro told Cohn that he was familiar with the type of transaction set out in the Northeast offering memorandum and that Cohn should be careful about the valuation of the Sentinel EPE recyclers. Shapiro considered valuation to be "the big problem" with that type of investment.

Cohn had no background in plastics or plastics recycling. He knew none of the principals at PI and never investigated PI. Cohn never investigated the price of virgin pellets as compared with recycled pellets. He never read any periodicals about the

plastics business.  Cohn never saw a Sentinel EPE recycler and never asked to see one.  He never visited an end-user.  Despite his many years in the syndication business and his great success in that business, with respect to the Northeast transaction, Cohn "did not spend hours and hours pouring over" the offering memorandum, but simply relied on Kravitz.

OPINION

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case involving the Clearwater transaction and another tier partnership, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c).  In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

The underlying transaction in these cases (the Northeast transaction) is in all material respects identical to the transaction considered in the Provizer case.  The Sentinel EPE

recyclers considered in these cases are the same type of machines considered in the Provizer case.

Based on the entire record in these cases, including the extensive stipulations, testimony of respondent's experts, and cross-examination of them, and petitioners' testimony, we hold that the Northeast transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiency. We note that petitioners explicitly conceded this issue at trial, in their briefs, and in a stipulation of settled issues. The record plainly supports respondent's determination regardless of such concession. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

In the notices of deficiency respondent determined that petitioners were liable for the negligence additions to tax under section 6653(a)(1) and (2) for 1981. Petitioners have the burden of proving that respondent's determination is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. In cases involving negligence, an additional amount is added to the tax under section 6653(a)(2); such amount is

equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973).

When petitioners claimed the disallowed deductions and tax credits, they had no knowledge of the plastics or recycling industries and no engineering or technical background. Petitioners did not independently investigate the Sentinel EPE recyclers.  Petitioners contend that they were reasonable in claiming deductions and credits with respect to Bellvine's investment in Northeast and attempt to distinguish their cases from Provizer v. Commissioner, supra, by arguing that the circumstances of their investment were unique.  Petitioners contend that it was reasonable for them to rely on Roberts because:  (1) Kravitz had prior dealings with Roberts in real estate matters, and (2) Roberts had waived his usual commission for petitioners.

Under some circumstances a taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if reasonable reliance on a competent professional adviser is shown.

Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Id. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Id.; see Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974).

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988). We have rejected pleas of reliance when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Beck v. Commissioner, 85 T.C. 557

(1985); Flowers v. Commissioner, 80 T.C. 914 (1983); Steerman v. Commissioner, T.C. Memo. 1993-447.

In his capacity as attorney, Kravitz dealt with Roberts or Grant in three real estate ventures during the period 1978 to 1981. Roberts was the general partner in the first venture in 1978. With respect to the latter two ventures, Kravitz could not recall at trial whether Roberts or Grant was the general partner; he knew only that it was one or the other. Kravitz testified that each of the real estate ventures closed without incident; he found the offering materials for each venture to be appropriate and correct with respect to the real estate aspects of the transaction.

Cohn testified that the significant feature to him in any offering was the performance and reputation of the general partner. Triemstra testified that among the factors that induced him to invest in Northeast was his reliance on Kravitz' "investigation" and prior dealings with Roberts, and the Government's supposed encouragement of this type of investment. There is no indication in the record that Cohn or Triemstra ever had any contact with Roberts or Grant. They knew only what Kravitz told them, and relied upon his impressions of Roberts and Grant.

Kravitz had no indication that either Roberts or Grant had any background in plastics or plastics recycling. Kravitz knew that Roberts' background was in banking and that Grant was a

securities lawyer.  Kravitz also knew that Roberts and Grant were both insiders in the Northeast transaction.  Roberts was a 9-percent shareholder in F & G in addition to being the general partner in Northeast.  Grant was the 100-percent owner of ECI.  The Northeast offering memorandum stated that both Roberts and Grant were promoters.  While Roberts waived his commission for petitioners, he still received a general partners' fee and percentage interest.  This fee and the percentage interest were unambiguously disclosed in the Northeast offering memorandum.  Similarly, Grant's position as sole shareholder of the "seller" (ECI) and the profitable nature of that position were disclosed in the offering memorandum.

We find that petitioners' reliance on Roberts and Grant, two promoters of Northeast, was not reasonable, not in good faith, nor based upon full disclosure.  See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion."  The record does not show that either Grant or Roberts possessed any special qualifications or professional skills in the recycling or plastics industries.  While Kravitz did, in his capacity as an attorney, deal with Roberts or Grant in three real estate ventures, the record does not convince us that these prior dealings, strictly limited to the real estate area in which Kravitz was experienced, provided any reasonable basis for his apparent blind faith in Roberts and Grant in plunging into a tax-

oriented venture in plastics recycling equipment. Triemstra and Cohn had no first-hand contact or discussion with Roberts or Grant; they relied exclusively on Kravitz' judgment.

Moreover, the Northeast transaction was not a type of investment encouraged by the Federal Government. According to the Northeast offering memorandum, the projected benefits for each $50,000 investor were investment tax credits in 1981 of $84,813, plus deductions in 1981 of $40,174. In the first year of the investment alone, petitioners Triemstra and Cohn each claimed an operating loss in the amount of $5,424 and investment tax and business energy credits related to Northeast totaling $11,308, while their cash payment for the investment in Northeast was only $6,000 each; Kravitz claimed an operating loss of $4,068 and investment credits totaling $8,482 on a cash outlay of $4,500. The direct reductions in petitioners' Federal income tax, from just the tax credits, equaled 188 percent of their cash payments for the investments. Therefore, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the [Northeast] deal." While the Government may have been encouraging energy conservation, it was not providing tax benefits for supposed investments that actually were shams and lacked economic substance. See Greene v. Commissioner, 88 T.C. 376 (1987).

While the three petitioners paid cash of $16,500, their total investment credit and business energy credits were $31,098, and they claimed total operating losses of $14,916 in 1981 alone. On their 1981 tax returns, Triemstra and Cohn each claimed a qualified investment with an unadjusted basis of $56,542, and Kravitz claimed such an investment of $42,407. The three partners in Bellvine claimed a total qualified investment with a basis of $155,491. With respect to the significance of the full investment, see Anderson v. Commissioner, 62 F.3d 1266 (10th Cir. 1995), affg. T.C. Memo. 1993-607.

Petitioners further contend that their failure to look beyond the Northeast offering memorandum was reasonable. Petitioners argue: (1) It was reasonable for them not to look beyond the offering memorandum but to accept its representations at face value because Federal and State securities laws discourage false or misleading statements, and (2) petitioners' familiarity with offering memoranda reasonably led them to believe that the cautionary language contained in the Northeast offering memorandum was for the exclusive benefit of the promoter and could therefore be disregarded.

Kravitz read the entire Northeast offering memorandum. The memorandum, and particularly the projections of anticipated business profits, supposedly convinced Kravitz that the Northeast transaction was a real business proposal. Kravitz did not check the figures in the offering memorandum or verify the charts with

the financial projections in any way.  Kravitz accepted the evaluators' reports without question; he did not inquire as to whether the evaluators were investors or had any conflict of interest.  The tax risk factors detailed in the offering memorandum did not raise any "red flags" for Kravitz because, he testified, he believed such caveats were insurance for the promoters against securities litigation.  While Kravitz knew the tax credits depended on the value of the Sentinel EPE recyclers, he testified that the fact that much of the purchase price was represented by F & G's nonrecourse notes did not concern him.

Triemstra testified that the representations in the Northeast offering memorandum indicated to him that it was unnecessary to look beyond the offering memorandum.  Triemstra understood that valuation of the Sentinel EPE recyclers was important for purposes of the investment and energy tax credits, and he also recognized that the transaction was structured "to fall within the strata of the tax benefits."  Triemstra accepted the representations in the offering memorandum regarding the Sentinel EPE recyclers and the reports of the evaluators.  Triemstra ignored the cautionary language in the Northeast offering memorandum because, he testified, he had seen other offering memoranda and they all contained such warnings and risk alerts.

As for Cohn, at trial he could not remember how thoroughly he read the Northeast offering memorandum, but he did recall

reading the draft legal opinion and the evaluators' reports included in the appendices. Cohn understood that the tax credits were dependent upon the value of the Sentinel EPE recyclers. Cohn contacted his tax preparer for the previous 25 years, Alvin Shapiro, a C.P.A. Shapiro told Cohn that he was familiar with this type of investment and cautioned Cohn to be careful of the valuation. Shapiro told Cohn that he thought that valuation was the predominant problem with this type of investment. Nonetheless, Cohn accepted the representations in the offering memorandum regarding the Sentinel EPE recyclers and their purported value. Cohn consulted a tax professional; without even seeing the offering memorandum, the tax professional told Cohn that the problem in this type of transaction is the valuation of the equipment. So Cohn was explicitly warned by his own tax adviser that the possibility of abuse in this deal most likely would be in the valuation, but Cohn chose to ignore his own adviser and simply accepted the valuation set by the promoters. Cohn also points out that he had syndicated many deals and had great financial and professional success prior to the plastics recycling investment. This impressive record only emphasizes that he had the skills and resources to evaluate the deal under consideration if he had exercised due care and had considered the warning of his own long-time tax adviser. Cf. Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228.

We hold that petitioners' failure to look beyond the Northeast offering memorandum and the representations by two insiders of Northeast was unreasonable and not in keeping with the standard of the ordinarily prudent person. See LaVerne v. Commissioner, 94 T.C. 637 (1990); Marine v. Commissioner, 92 T.C. 958 (1989). We find no merit in petitioners' argument about their supposed faith in the representations in the offering memorandum allegedly based on the concept that Federal and State securities laws discourage false and misleading statements. Petitioners' educational backgrounds and professional experience belie such feigned naivety. Likewise, since petitioners were experienced attorneys familiar with offering memoranda, we are unconvinced by their contention that they reasonably disregarded the cautionary language and risk alerts because they believed such admonitions were inserted for the benefit of the promoter. On its face, the cautionary language is directed to the investor. Petitioners have presented no reason for us to doubt that the cautionary language means what it says.

Petitioners' reliance on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, and Ewing v. Commissioner, 91 T.C. 396 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991), is misplaced. The facts in the Heasley case are distinctly different from the facts of these cases. In the Heasley case, the taxpayers were not educated beyond high school and had limited investment experience, while

petitioners herein were highly educated, sophisticated, and successful practicing attorneys with previous investment experience individually or in practice.  Kravitz counseled clients on a number of real estate syndications and had reviewed numerous offering memoranda.  Cohn testified at trial that he had syndicated almost 100 deals.  Triemstra was an experienced attorney and made investments in a gas exploration venture and a mobile home park in 1981.

The taxpayers in the Heasley case actively monitored their investment and, as the Fifth Circuit Court of Appeals stated, intended to profit from the investment.  We cannot reach similar conclusions in the present cases.  The record shows that of the three petitioners, only Kravitz received updates reporting the progress of the Sentinel EPE recyclers and financial statements prepared by nonindependent accountants.  Yet even though an August 1982 update indicated to Kravitz that the recyclers were not performing up to expectations, he decided to invest in more recyclers that same year.  The evidence in these cases is that petitioners anticipated benefits primarily from tax savings. Petitioners have failed to provide evidence of any serious efforts to monitor the investment or reliable evidence of any profit objective independent of tax savings.  We consider petitioners' arguments with respect to the Heasley case inapplicable.

In the Ewing case, the taxpayers' reliance on a legal opinion letter included in an offering memorandum was considered reasonable because several of the taxpayers had known and successfully dealt with the author of the opinion for over 10 years. With respect to these cases, however, nothing in the record indicates that any of petitioners knew the authors of the draft opinion letter included in the Northeast offering memorandum. Instead, only one of petitioners had from one to three business dealings in real estate matters with the general partner of the venture over a 3-year period preceding the investment. Accordingly, we consider petitioners' arguments with respect to the Ewing case inapplicable.

We conclude that petitioners Triemstra, Cohn, and Kravitz were negligent in claiming the deductions and credits with respect to Bellvine's investment in Northeast on their respective 1981 Federal income tax returns. We hold, upon consideration of the entire record in docket Nos. 14254-89, 17923-89, and 18126-89, that petitioners Triemstra, Cohn, and Kravitz are liable for the respective negligence additions to tax under the provisions of section 6653(a)(1) and (2) for 1981.

Decisions will be entered
for respondent.