T.C. Memo. 1996-341


UNITED STATES TAX COURT


WILLIAM AND JOAN SPEARS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

VINCENT AND CLOTILDE FARRELL, JR., Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 27393-89, 28082-89.     Filed July 30, 1996.


<u>Bernard S. Mark</u> and <u>Richard S. Kestenbaum</u>, for petitioners in docket No. 27393-89.

<u>Hugh Janow</u>, for petitioners in docket No. 28082-89.

<u>Lawrence L. Davidow</u> and <u>Frances Ferrito Regan</u>, for respondent in docket No. 27393-89.

<u>Barry J. Laterman</u>, for respondent in docket No. 28082-89.

CONTENTS

                                                          Page
MEMORANDUM FINDINGS OF FACT AND OPINION........................2
OPINION OF THE SPECIAL TRIAL JUDGE............................3
FINDINGS OF FACT.............................................7
    A.  The Plastics Recycling Transactions.....................7
    B.  The Partnerships.......................................9
    C.  Stuart Becker, Steven Leicht, and Noel Tucker..........12
    D.  Petitioners and Their Introduction to the Partnership
        Transactions.........................................18
OPINION......................................................25
    A.  Section 6653(a) - Negligence..........................28
        1.  The So-Called Oil Crisis.........................30
        2.  Petitioners' Purported Reliance on Becker..........35
            a.  The Circumstances Under Which a Taxpayer May
                Avoid Liability Under Section 6653(a)(1) and (2)
                Because of Reasonable Reliance on Competent and
                Fully Informed Professional Advice.............35
            b.  Petitioners' Investment Experience,
                Sophistication, and Resources..................38
            c.  Becker's Limited Investigation and Technological
                Knowledge and His Emphasis on Disclosure and on
                Protection Against Liability...................40
            d.  Conclusion Concerning Petitioners' Alleged
                Reliance on Becker.............................46
        3.  The Private Offering Memoranda.....................48
        4.  Miscellaneous......................................53
        5.  Conclusion As to Negligence........................57
    B.  Section 6659 - Valuation Overstatement..................58
        1.  The Grounds for Petitioners' Underpayments.........60
        2.  Concession of the Deficiency.......................64
        3.  Section 6659(e)....................................68

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[1]  They were tried and

---

[1]    All section references are to the Internal Revenue Code in effect for the years in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

(continued...)

briefed separately but consolidated for purposes of opinion. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The underlying transactions in these cases are substantially identical to the transaction considered in the Provizer case.

In a notice of deficiency dated August 21, 1989, respondent determined a deficiency in the 1982 joint Federal income tax of William and Joan Spears in the amount of $66,426 and additions to tax for that year in the amount of $19,928 under section 6659 for valuation overstatement, in the amount of $3,321 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on the underpayment attributable to negligence. Respondent also determined that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).

---

[1](...continued)

In a notice of deficiency dated August 25, 1989, respondent determined deficiencies in Vincent and Clotilde Farrell's Federal income tax for 1980 and 1982 in the respective amounts of $55,242 and $51,236. Respondent also determined that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). On February 24, 1994, respondent filed an amendment to answer and asserted reduced deficiencies for taxable years 1980 and 1982 in the respective amounts of $29,590 and $51,043. Respondent also asserted additions to tax for taxable year 1982 in the amount of $12,127 under section 6659 for valuation overstatement, in the amount of $2,552 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in an amount equal to 50 percent of the interest due on $50,278. Finally, respondent asserted that for taxable years 1980 and 1982, deficiency amounts of $14,795 and $50,278, respectively, were subject to the increased rate of interest under section 6621(c).[2]

Petitioners Joan Spears and Clotilde Farrell were named in the respective notices of deficiency and are petitioners herein because they filed joint Federal income tax returns with their husbands during the taxable years in issue. For convenience, generally hereafter in discussing or mentioning petitioners

---

[2]    We note that respondent had determined in the statutory notice of deficiency as well that the provision for increased interest under sec. 6621(c) applied.

Spears we refer to William Spears (Spears), and in discussing or mentioning petitioners Farrell we refer to Vincent Farrell (Farrell).

On April 22, 1992, respondent and Farrell filed a Stipulation of Settled Issues resolving all issues except for issues relating to his participation in the Plastics Recycling Program during taxable year 1982.[3]  On March 31, 1994, respondent and Farrell filed another Stipulation of Settled Issues addressing the issues relating to his participation in the Plastics Recycling Program.  A virtually identical Stipulation of Settled Issues was filed by respondent and Spears on March 9, 1994.  These stipulations provide:

> 1.  Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.
>
> 2.  The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).

---

[3]  Farrell and respondent stipulated:  (1) Mr. and Mrs. Farrell are liable for a deficiency in the amount of $29,589 for taxable year 1980; (2) $14,795 of that amount is subject to the increased rate of interest under sec. 6621(c); (3) the loss of $1,906 claimed on Schedule E of their 1982 Federal income tax return, and the corresponding adjustment in the notice of deficiency, relate to their investment in SAB Associates; and (4) they are entitled to deduct $381 with respect to their interest in SAB Associates for 1982.

3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

4. With respect to the issue of the addition to the tax under I.R.C. §6659, petitioners do not intend to contest the issue of the value of the Sentinel Recycler or the existence of a valuation overstatement on the petitioners' return; however, petitioners preserve their right to contest the issue of whether I.R.C. §6659 is applicable under the facts and circumstances of this case.[4]

The only issues remaining in these consolidated cases are: (1) Whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2); and (2) whether petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable to valuation overstatement.

Farrell's motion for decision, based in general upon circumstances not discussed herein, has been denied for reasons set forth in Farrell v. Commissioner, T.C. Memo. 1996-295.

---

[4]    The stipulation executed by respondent and Farrell refers specifically to their 1982 tax returns.  Also, the last clause of the fourth stipulation reads:  "however, petitioners preserve their right to argue that the underpayment in tax is not attributable to a valuation overstatement within the meaning of I.R.C. §6659(a)(1), and that the Secretary should have waived the addition to tax pursuant to the provisions of I.R.C. §6659(e)."

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

A. The Plastics Recycling Transactions

These cases concern petitioners' investments in two limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers: SAB Resource Recycling Associates (SAB Recycling) and SAB Resource Reclamation Associates (SAB Reclamation). Spears is a limited partner in SAB Recycling and Farrell is a limited partner in SAB Reclamation. For convenience we refer to these partnerships collectively as the Partnerships.

The transactions involving the Sentinel EPE recyclers leased by the Partnerships are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which

sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, each of the Partnerships leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp. The transactions of the Partnerships differ from the underlying transaction in the Provizer case in the following respects: (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp.; and (2) the number of

recyclers that the Partnerships leased and licensed.[5]  For convenience we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions.  In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene recyclers.  We refer to these collectively as the Plastics Recycling transactions.

B.  The Partnerships

SAB Recycling and SAB Reclamation are New York limited partnerships that were organized and promoted in 1982 by Stuart Becker (Becker), a certified public accountant (C.P.A.) and the founder and principal owner of Stuart Becker & Co., P.C. (Becker Co.), an accounting firm that specialized in tax matters.  Becker organized a total of six recycling partnerships (the SAB recycling partnerships).  Two of the SAB recycling partnerships closed in late 1981, two closed in early 1982, and two more closed in late 1982.

---

[5]    According to the offering memoranda, SAB Reclamation was to lease and license eight recyclers and SAB Recycling was to lease and license seven recyclers.  However, the SAB Reclamation partnership tax return for 1982 indicates that it leased and licensed only four recyclers.

The general partner of each of the SAB recycling partnerships, including SAB Reclamation and SAB Recycling, is SAB Management Ltd. (SAB Management). SAB Management is wholly owned by Scanbo Management Ltd. (Scanbo),[6] which is wholly owned by Becker. The officers and directors of SAB Management and Scanbo are: (1) Becker, president and director; (2) Noel Tucker (Tucker), vice president, treasurer, and director; and (3) Steven Leicht (Leicht), vice president, secretary, and director. During the years in issue, Tucker and Leicht also worked at Becker Co. Tucker was vice president. Each owned approximately 5 to 7 percent of the stock of Becker Co. SAB Management did not engage in any business before becoming involved with the SAB recycling partnerships.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners. Reports by F & G's evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memoranda. In a section highlighting potential conflicts of interest, each of the memoranda notes that Burstein was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

---

[6]    Scanbo is an acronym for three of Becker's children:  Scott, Andy, and Bonnie.

The offering memoranda of SAB Reclamation and SAB Recycling provide that SAB Management will receive general partner fees in the respective amounts of $110,000 and $97,375 from those partnerships. SAB Management received fees of approximately $500,000 as the general partner of the SAB recycling partnerships. In addition, Becker Co. prepared the partnership returns and Forms K-1 for all of the SAB recycling partnerships and received fees for those services.

The offering memoranda of SAB Reclamation and SAB Recycling state that sales commissions and offeree representative fees will be paid in amounts equal to 7.5 percent of each investment guided to the partnerships and that SAB Management, as the general partner of those partnerships, may retain as additional compensation all amounts not so paid. However, neither Becker nor SAB Management retained or received any sales commissions or offeree representative fees. Instead, after the closing of each SAB recycling partnership, Becker rebated to each investor whose investment was not subject to a sales commission or offeree representative fee an amount equal to 7.5 percent of such investor's original investment.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service

(IRS) and the purchase price paid by F & G to ECI Corp. probably will be challenged as being in excess of fair market value; (2) the Partnerships have no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

C.  Stuart Becker, Steven Leicht, and Noel Tucker

Becker does not have an engineering background, and he is not an expert in plastics materials or plastics recycling.  He received a B.S. degree in accounting from New York University in 1964 and an M.B.A. in taxation from New York University Graduate School of Business Administration in 1973.  Becker passed the certified public accountancy test in 1967 and was the winner of the gold medal, awarded for achieving the highest score on the examination for that year.  Since early 1966, Becker has practiced as an accountant exclusively in the tax area.  From 1964 until 1972 he worked for the accounting firm of Touche Ross & Co., and in 1972 he joined the accounting firm of Richard A.

Eisner & Co. as the partner in charge of the tax department.  In 1977, Becker founded Becker Co.

Becker had considerable experience with tax shelter transactions before he organized the SAB recycling partnerships. He prepared opinions regarding tax shelters' economic and tax projections, advised individuals and companies with respect to investments in tax shelters, lectured extensively about tax shelter investments generally, and lectured and published with respect to leveraged tax shelters.[7]  Becker Co. specialized in tax advantaged investments.  From 1980 to 1982, approximately 60 percent of the work done by Becker Co. involved tax sheltered and private investments.  Becker has owned minority interests in general partners of numerous limited partnerships.  Prior to organizing the SAB recycling partnerships, Becker was a 5-percent owner of the general partner of partnerships involved in approximately 14 transactions involving river transportation (such as barges, tow boats, and grain elevators).

---

[7]    Becker described a leveraged tax shelter as "a transaction where [the ratio of] the effective [tax] writeoff, which includes the value of the tax credit, * * * [to the amount invested] exceeds one to one."

Although investment counseling was related to his firm's line of business, Becker did not consider himself in the business of providing investment advice. Becker did not normally hire other professionals for consultation or advice. In circumstances where he believed there was a need for outside advice, he would so advise the client. Between 30 and 40 of Becker's clients invested in the Plastics Recycling partnerships.

Becker learned of the Plastics Recycling transactions when a prospective client presented him with an offering memorandum concerning the transactions in August or September 1981. Becker reviewed the offering memorandum and spoke to Miller, one of the key figures in the transactions and an acquaintance of Becker's. Miller was a shareholder of F & G Corp. and, as noted, the corporate counsel to PI. Thereafter, Becker recommended the investment to the prospective client. Although the prospective client did not invest in the Plastics Recycling transactions, Becker became interested in the proposal and organized the SAB recycling partnerships in order to make similar investments in Sentinel EPE recyclers conveniently available to appropriate clients.

In organizing the SAB recycling partnerships, Becker was not allowed to change the format of the transactions or the purchase, lease, or licensing prices of the Sentinel EPE recyclers. He was allowed only to conduct a limited investigation of the proposed

investments and choose whether or not to organize similar partnerships. Becker relied heavily upon the offering materials and discussions with persons involved in the matter to evaluate the Plastics Recycling transactions. He and two other members of Becker Co., Leicht and Tucker, investigated PI and visited its plant in Hyannis, Massachusetts, where they saw the Sentinel EPE recyclers.

During his investigation of the Plastics Recycling transactions Becker did not hire any plastics, engineering, or technical experts, or recommend that his clients do so. Becker discussed the transactions with Michael Canno, of the Equitable Bag Co., a manufacturer of paper and plastic bags. Canno never saw the recyclers or the pellets and never wrote any reports assessing the equipment or the pellets.

Becker retained a law firm, Rabin & Silverman[8], to assist him with the legal aspects of organizing the SAB recycling partnerships, such as reviewing and/or preparing documents in connection with the SAB recycling partnerships. Michael D. DiGiovanna[9] (DiGiovanna), a partner at Rabin & Silverman and a

---

[8]    Rabin & Silverman has undergone several name changes since that time. At the time of trial, the successor firm was called Dornbush, Mensch, Mandelstam & Schaeffer.

[9]    The testimony of DiGiovanna was stipulated into the record in docket No. 28082-89 (the Farrell case), but not docket No. 27393-89 (the Spears case). His testimony has been disregarded

(continued...)

specialist in securities and corporate law, advised Becker regarding his disclosure obligations under the securities laws and his protection against liability.  In so advising Becker, DiGiovanna was not responsible for, and did not get, independent verification of any of the representations in the offering materials.  He never visited PI or saw a Sentinel EPE recycler. DiGiovanna did not have any education or experience in engineering, plastics materials, or plastics recycling.

Leicht and Tucker also familiarized themselves with the Plastics Recycling transactions.[10]  Leicht has a B.A. degree in finance and accounting from Penn State University, a J.D. from SUNY Buffalo, and an LL.M. in Taxation from New York University School of Law.  Leicht ran a mathematical check on the numbers contained in the offering materials for Becker, but he did not test the underlying assumptions upon which they were based.  He also visited PI in Hyannis and met with Miller and other insiders to the transactions.  Leicht never communicated an opinion as to the value of the recyclers other than what was presented in the

---

[9](...continued)
with respect to the Spears case.

[10]    Leicht testified only in docket No. 28082-89 (the Farrell case).  His testimony has been disregarded with respect to docket No. 27393-89 (the Spears case).

offering memoranda.  He has no education or expertise in plastics materials or plastics recycling.

Tucker did not testify at trial.  However, Spears submitted two memoranda written by Tucker and addressed to Becker relating to the Plastics Recycling transactions.  One memorandum, dated November 12, 1981, is an evaluation of the financial projections for SAB Leasing Associates (SAB Leasing).  Tucker checked all of the computations in the financial projections prepared by the management of PI for SAB Leasing, and created several additional schedules using variable inflation rates and royalty rates.  The second memorandum, dated September 24, 1982, briefly describes a visit with Becker to PI and contains two additional schedules using variable numbers.

After the 1981 SAB recycling partnerships closed, Becker had an accountant sent to PI to confirm, by serial number, that as of December 31, 1981, the equipment that was leased to the 1981 SAB recycling partnerships was indeed available for use.  Becker arranged for this verification, independent of PI, because he understood that the investment tax and business energy credits would not be available if the qualifying property was not available for use.

D.  Petitioners and Their Introduction to the Partnership
Transactions

Petitioners William and Joan Spears resided in Greenwich,
Connecticut, at the time their petition was filed.  Spears earned
a B.A. in politics and graduated with honors from Princeton
University in 1960.  He then attended the Harvard School of
Business where he graduated with distinction in 1962.  In July
1962 he joined Loeb, Rhoades & Co. (Loeb, Rhoades) as a
securities analyst.  At Loeb, Rhoades, Spears concentrated on the
pharmaceutical and retail industries until 1968, when he acquired
responsibilities in investment management.  Spears became a
general partner at Loeb, Rhoades before leaving in 1971.  In
January 1972, he formed his own investment management firm, W.G.
Spears, Inc., which eventually became Spears, Benzak, Salomon &
Farrell (Spears, Benzak).  From its formation until the time of
trial, Spears, Benzak has managed funds principally for wealthy
individuals, endowment funds, foundations, and pension funds.

Petitioners Vincent and Clotilde Farrell resided in Katonah,
New York, when their petition was filed.  Farrell earned a B.A.
in history from Princeton University and an M.B.A. from Iona
College Graduate School of Business.  Immediately after college,
in 1969, Farrell was employed as a high school teacher and

football coach.  Four years later he joined the investment firm of Smith, Barney, Harris & Upham (Smith, Barney).  Farrell became a successful retail salesman for Smith, Barney and eventually influenced the investment of approximately $50 million.  In 1982 Farrell became a partner at the investment management firm of Spears, Benzak in midtown Manhattan.  Over the next 12 years Spears, Benzak increased the amounts it had under management from approximately $150 million to nearly $3 billion.

On their joint 1982 Federal Income tax return, William and Joan Spears reported gross income from wages, interest, dividends, State and local tax refunds, and capital gains in excess of $700,000.  On their 1982 return, Vincent and Clotilde Farrell reported gross income from wages, interest, dividends, and State and local tax refunds in excess of $250,000.  Consequently, in the absence of significant deductions or credits, petitioners in these consolidated cases were subject to payment of Federal income taxes in substantial amounts.

Spears and Farrell are both partners in SAB Associates, a limited partnership initially involved in tax straddle investments.  During 1981, the tax laws changed and as a consequence SAB Associates was likely to realize substantial gains.  SAB Associates ceased engaging in tax straddle

investments that year and changed its function to leasing Sentinel EPE recyclers. Partners were given the option of withdrawing their capital accounts or continuing with the partnership. In December 1981, SAB Associates invested $569,600 in SAB Resource Recovery Associates and $975,000 in SAB Leasing Associates. Investment tax credits and business energy credits with respect to petitioners' shares of these investments are not reflected in the records in these cases, presumably because the investments were made in 1981. Only the operating losses in 1982 are documented in the record in these cases.

In 1982, Spears acquired a 2.538461-percent interest in SAB Recycling for $25,000.[11] On their 1982 return, he and his wife Joan claimed an operating loss in the amount of $19,870 and investment tax and business energy credits totaling $41,320[12] with respect to his interest in SAB Recycling. They also claimed an operating loss in the amount of $1,145 with respect to their interest in SAB Associates. Respondent disallowed all of their

---

[11]  The gross amount Spears invested is $25,000, unreduced by any sales commission rebate or his share of any advance royalty distributed to him.

[12]  The regular investment tax credit claimed by Spears and his wife totaled $54,863, but only $20,660 of that amount was attributable to SAB Recycling.

claimed operating losses and credits related to their interests in SAB Recycling and SAB Associates.

In 1982, Farrell acquired a 4.5-percent limited partnership interest in SAB Reclamation for $25,000.[13]  On their 1982 return, he and his wife Clotilde claimed an operating loss in the amount of $20,050 and investment tax and business energy credits totaling $41,856,[14] both flowing from his interest in SAB Reclamation.  The Farrells also claimed an operating loss in the amount of $1,906 with respect to SAB Associates.[15]  Respondent disallowed all but $386 of the Farrell's 1982 claimed operating losses and credits related to SAB Reclamation and SAB Associates.[16]

---

[13]     Farrell testified that he believed he had invested $20,000. His Form K-1, Partner's Share of Income, Credits, Deductions, etc., attached to SAB Reclamation's partnership return, indicates that he invested $25,000.  We note that the $25,000 figure is the gross amount Farrell invested, unreduced by any rebated sales commission or his share of any advance royalty distributed to him.

[14]     The regular investment tax credit claimed by Farrell and his wife totaled $21,314, but only $20,928 of that amount was attributable to SAB Reclamation.

[15]     As noted, respondent and Farrell stipulated that for taxable year 1982, he and his wife are entitled to deduct $381 with respect to their interest in SAB Associates.

[16]     Respondent explained in the notice of deficiency that
(continued...)

Spears and Farrell both learned of the Partnership transactions from Becker. Becker and Spears met in 1974 when Spears attended board meetings and otherwise represented the interests of a substantial investor in a company for which Becker provided accounting services. Spears was impressed with Becker and hired him to perform accounting and tax work for Spears individually and for his company. During that time Spears was also a client and friend of Farrell, and he recommended that Farrell and Becker meet. Farrell hired Becker Co. to prepare his returns. Becker also occasionally presented Farrell with tax-advantaged investments and eventually provided advice in connection with Farrell's joining Spears, Benzak. Farrell did not rely on Becker with respect to general investment issues because he did not think that was Becker's area of expertise. He

---

[16](...continued)
Farrell and his wife were not entitled to any investment tax credit or business energy tax credit from SAB Associates and SAB Reclamation. In both the notice of deficiency and the amendment to answer, however, respondent allowed $772 of the total investment and business energy credits claimed by the Farrells. The Farrells claimed a total of $42,242 in investment tax and business energy tax credits. Of that amount, $41,856 derived from their interest in SAB Reclamation (with a basis of $209,280 in the equipment, the investment tax and business energy tax credits equal $41,856), and $386 was unrelated to SAB Reclamation ($42,242 - $41,856 = $386). Consequently, it appears that in allowing $772 of total credits, respondent actually allowed $386 of credits related to SAB Reclamation.

considered Becker knowledgeable with respect to the tax code and tax advantaged investments. Farrell would not discuss investments with Becker if they did not have tax benefits.

The tax benefits associated with the Partnership transactions were a primary investment consideration for Spears. He understood that he would have taxable income to report when SAB Associates discontinued its tax straddle business, and that the investment tax credits from the recyclers would be available to those partners who rolled over their investments and remained with SAB Associates. Spears reviewed the offering memorandum for SAB Recycling, and he and Becker discussed the Sentinel EPE recyclers and the Partnership transactions in general. Spears relied upon Becker more than he did the offering materials. Spears knew he was not able to understand the plastics recycling technology. He explained that when Spears, Benzak required analysis of technology investments, the firm "would rely * * * on others" who had knowledge of the technology in question. However, even though Spears was the founder and a senior member of Spears, Benzak, which was a substantial investment counseling firm, he did not consider it appropriate to "bring resources from within [his] firm to bear on a personal investment".

Spears did not know the number of SAB recycling partnerships in which Becker was the general partner. Although Spears knew that Becker was not an expert in plastics recycling, he never asked Becker if he had sought advice from an expert independent of the Partnership and insiders to the Partnership transactions. Spears claims that he believed the price of the recyclers had been negotiated at arm's length and that he was unaware of whether there was an established market for the recycling equipment. In fact, as Spears stipulated, no negotiations for the price of the Sentinel EPE recyclers took place between or among PI, ECI, and F & G, and the offering memoranda clearly disclosed that there was no established market for leasing or operating the Sentinel EPE recyclers.

Becker introduced the Plastics Recycling transactions to Farrell in mid to late 1980. The tax benefits interested Farrell. He understood that the tax credits would exceed his investment and thereby eliminate any out-of-pocket investment expense. He knew Becker was not a plastics recycling expert, but believed Becker was capable of judging the tax aspects of the transactions, if not the technical aspects of them. Farrell never asked Becker if he consulted any experts. Farrell did not

know whether Becker had consulted only PI personnel and other insiders or whether he had spoken with independent experts.

Petitioners in these consolidated cases never made a profit in any year from their participation in the Partnership transactions. Spears and Farrell did not see a Sentinel EPE recycler prior to investing in the Partnership transactions. Petitioners in each case do not have any education or work experience in plastics recycling or plastics materials.

OPINION

We have decided more than two dozen of the Plastics Recycling group of cases.[17] The majority of these cases, like

---

[17] Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.

The following cases concerned the addition to tax for negligence, inter alia: Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v. Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner, T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580; Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C. Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387; Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v. Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C. Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257; Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v.

(continued...)

the consolidated cases herein, raised issues regarding additions

to tax for negligence and valuation overstatement.  We have found

the taxpayers liable for such additions to tax in all but one of

the opinions to date on these issues, although procedural rulings

have involved many more favorable results for taxpayers.[18]

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test

case for the Plastics Recycling group of cases, this Court (1)

found that each Sentinel EPE recycler had a fair market value not

in excess of $50,000, (2) held that the transaction, which is

---

[17](...continued)
Commissioner, T.C. Memo. 1995-181; Eisenberg v. Commissioner,
T.C. Memo. 1995-180.
    Greene v. Commissioner, 88 T.C. 376 (1987), concerned the
applicability of the safe-harbor leasing provisions of sec.
168(f)(8).  Trost v. Commissioner, 95 T.C. 560 (1990), concerned
a jurisdictional issue.  Baratelli v. Commissioner, T.C. Memo.
1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435;
Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling
Associates v. Commissioner, T.C. Memo. 1992-645; Madison
Recycling Associates v. Commissioner, T.C. Memo. 1992-605,
concerned other issues.

[18]    In Zidanich v. Commissioner, T.C. Memo. 1995-382, we held
the taxpayers liable for the section 6659 addition to tax, but
not liable for the negligence additions to tax under section
6653(a).  As indicated in our opinion, the Zidanich case, and the
Steinberg case consolidated with it for opinion, involved
exceptional circumstances.
    In Estate of Satin v. Commissioner, supra, and Fisher v.
Commissioner, supra, after the decision in Provizer v.
Commissioner, supra, the taxpayers were allowed to elect to
accept a beneficial settlement because of exceptional
circumstances.

almost identical to the Partnership transactions in these consolidated cases, was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases are similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in these consolidated cases, and the Sentinel EPE recyclers considered in these cases, are the same type of transaction and same type of machine considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and

petitioner's testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the respective stipulations of settled issues filed shortly before trial. The record plainly supports respondent's determination regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

## A.  Section 6653(a) - Negligence

In a notice of deficiency, respondent determined that petitioners William and Joan Spears are liable for the negligence additions to tax under section 6653(a)(1) and (2). Spears has the burden of proving that respondent's determination is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

In an amendment to answer, respondent asserted that petitioners Vincent and Clotilde Farrell are liable for additions to tax for negligence under section 6653(a)(1) and (2). Because respondent raised these additions to tax for the first time in an

amendment to answer, respondent has the burden of proof on these issues. Rule 142(a); <u>Vecchio v. Commissioner</u>, 103 T.C. 170, 196 (1994).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See <u>Henry Schwartz Corp. v. Commissioner</u>, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. <u>McPike v. Commissioner</u>, T.C. Memo. 1996-46.

Petitioners each contend that they were reasonable in claiming deductions and investment credits with respect to their investments in the Partnerships. In support of such contentions, petitioners each argue, in general terms: (1) That claiming the deductions and credits with respect to the Partnerships was reasonable in light of the so-called oil crisis during the years in issue and (2) that they reasonably relied upon the offering materials and a qualified adviser.

In the cases before us, expert testimony by report establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment credits and purported losses based on vastly exaggerated valuations of recycling machinery. Also, we are unconvinced by the claim of these highly sophisticated, able, and successful investors that they acted reasonably in failing to inquire about their investment and simply relying on the offering circulars and on Becker, despite warnings in the offering circulars and explanations by Becker about the limitations of his investigation. In each case these taxpayers knew or should have known better.

1.  The So-Called Oil Crisis

Petitioners each argue that because plastics materials are oil derivatives, they reasonably believed that the Partnership transactions had good economic potential in light of the alleged oil crisis in the United States during 1981. However, petitioners failed to explain exactly how such supposed oil crisis provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits.

The offering materials warned that there could be no assurances that prices for new resin pellets would remain at their then current level. One of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil. In his report, he stated that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." Moreover, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Spears placed into the record several articles from Modern Plastics and an energy projections report from the U.S.

Department of Energy (DOE), all published in the years 1980 and
1981. Both the articles from Modern Plastics and the report by
the DOE speculated on the price of oil, among other things. The
preface to the DOE report cautioned about "the tremendous
uncertainties underlying energy projections" and warned "that
[their] projections do not constitute any sort of blueprint for
the future." Reflective of such uncertainties, an April 1980
article in Modern Plastics contemplated resin price hikes, while
a May 1981 article predicted a leveling off of prices, market
disruptions, and an industrywide shakeout. Spears does not
purport to have read, or in any way relied upon, the DOE report
or the Modern Plastics articles, and has not otherwise explained
the connection between these speculative materials and his
investing in the Partnerships.

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132
(1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024
(10th Cir. 1994), and Rousseau v. United States, 71A AFTR 2d 93-
4294, 91-1 USTC par. 50,252 (E.D. La. 1991), is misplaced. The
facts in Krause v. Commissioner, supra, are distinctly different
from the facts of these cases. In the Krause case, the taxpayers
invested in limited partnerships whose investment objectives
concerned enhanced oil recovery (EOR) technology. The Krause

opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Id. at 177. In the present cases, however, as explained by respondent's expert Grossman, supra, the price of plastics materials was not directly proportional to the price of oil, and there is no persuasive evidence that the so-called oil crisis had a substantial bearing on petitioners' decisions to invest. While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called oil crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the Krause case

undertook significant investigation of the proposed investment including researching EOR technology.  The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials.  Id. at 166.  In the present cases, petitioners had no education or work experience with respect to plastics or plastics recycling.  There is no indication in the records that either of petitioners independently investigated the Sentinel EPE recyclers or hired an expert in plastics to evaluate the Partnership transactions.

In Rousseau v. United States, supra, the property underlying the investment, ethanol producing equipment, was widely considered at that time to be a viable fuel alternative to oil, and its potential for profit was apparent.  In addition, the taxpayer therein conducted an independent investigation of the investment and researched the market for the sale of ethanol in the United States.  In contrast, as we noted in distinguishing the Krause case, there is no showing in these records that the so-called oil crisis would provide a reasonable basis for petitioners' investing in the polyethylene recyclers here in question.  There is no indication in the records that petitioners independently investigated the Sentinel EPE recyclers or hired an

expert in plastics to evaluate the Partnership transactions.  The facts of petitioners' cases are distinctly different from the Rousseau case.  Accordingly, we do not consider petitioners' arguments with respect to the Krause and Rousseau cases applicable.

### 2.  Petitioners' Purported Reliance on Becker

Petitioners also maintain that they reasonably relied upon the advice of a qualified adviser, Becker.[19]

### a.  The Circumstances Under Which a Taxpayer May Avoid Liability Under Section 6653(a)(1) and (2) Because of Reasonable Reliance on Competent and Fully Informed Professional Advice

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice.  United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Reliance on professional advice, standing alone, is

---

[19]    We note that Farrell extensively argues this point in his posttrial brief.  In general, some of Farrell's factual positions conflict with the record of his case, and the principal cases that he cites are inapplicable and distinguishable for the following general, nonexclusive reasons:  (1) They involve far less sophisticated taxpayers; (2) the reasonableness of the respective taxpayers' reliance on expert advice was established in those cases on grounds that do not exist here; and (3) the advice given was within the adviser's area of expertise.

not an absolute defense to negligence, but rather a factor to be considered.  In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide valuable and dependable advice on the subject matter.  Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995).

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  Goldman v. Commissioner, supra; Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), affg. T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988).  Pleas of reliance have been rejected when neither the taxpayer nor the

advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Goldman v. Commissioner, supra; Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985); Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995); Steerman v. Commissioner, T.C. Memo. 1993-447; Rogers v. Commissioner, T.C. Memo. 1990-619.

The concept of negligence and the argument of reliance on an expert is highly fact intensive. In these cases two remarkably capable and successful investment advisers, experienced and able at investigating investment proposals, assert that they relied upon their accountant to investigate the tax law and the underlying business circumstances of a proposed investment. The accountant explains that he made an investigation within the limits of his resources and abilities and fully disclosed what he had done. The question here is whether petitioners actually and reasonably relied on the accountant with respect to valuation problems requiring expertise in engineering and plastics technology or whether the accountant gave the tax advice and facilitated the transaction, but did not make a full and independent investigation of the relevant business and technology, and did clearly inform his clients of the limits of

his knowledge and investigation of the transaction.  For reasons set forth below, we believe the latter statement more accurately describes what happened here.

###### b.  Petitioners' Investment Experience, Sophistication, and Resources

Petitioners claim that they reasonably relied upon Becker when they knew that:  (1) His forte was the tax analysis aspect of so-called tax shelter transactions and (2) he had no experience or expertise in plastics materials or plastics recycling.  Yet petitioners' education and professional experience, and portions of their own testimony in these cases, indicate that they clearly knew better than to rely upon a person for advice on matters beyond his or her expertise.

Petitioners Spears and Farrell are very well educated and exceptionally sophisticated in investment and financial matters. The two have had outstanding careers investing and managing funds for wealthy individuals and institutions; without question they are highly proficient and knowledgeable investors.  During Farrell's employment at Smith, Barney, approximately $50 million of client funds were Farrell's responsibility.  Spears became a partner at Loeb, Rhoades & Co. less than 10 years after his initial employment there.  At the time of trial Spears, Benzak

was investing and managing nearly $3 billion of client funds.  In view of their impressive investment experience and skill, there is little doubt that if petitioners themselves had thoroughly investigated the Plastics Recycling transactions before investing, they surely would have learned that the recyclers were overvalued and therefore the tax benefits flowing from the Partnerships were illusory.

Spears testified that his firm's policy for investigating investment opportunities was to rely heavily on people who had studied the subject industry in depth.  Yet Becker was not an expert in plastics materials or plastics recycling, and he did not study the plastics recycling industry in depth.  Becker's "investigation" did not even uncover that competing, less expensive recyclers were already on the market.  Even though Spears knew that Becker had no expertise in plastics materials or plastics recycling, he never asked Becker if he had consulted any plastics experts who were independent of the transactions.  Spears testified that he simply assumed Becker had consulted the appropriate experts.

While Farrell was at Smith, Barney, he did not perform any due diligence for any proposed investments because such work was done by the department or committee proposing or sponsoring the

investment, such as the tax shelter department.  Even though Farrell was comfortable with the due diligence efforts at Smith, Barney, he testified that he "very rarely offered" the tax shelter investments to his clients because he "did not consider himself knowledgeable enough" in the subject areas of the investments.  Similarly, Farrell testified that he did not rely on Becker for general investment issues because he did not think that was Becker's area of expertise.  Farrell knew that Becker's area of expertise was taxation, and he explained that he would not discuss investments with Becker if they did not have tax benefits.

### c.  Becker's Limited Investigation and Technological Knowledge and His Emphasis on Disclosure and on Protection Against Liability

In evaluating the Plastics Recycling transactions and organizing the SAB recycling partnerships, Becker supposedly relied upon:  (1) The offering materials; (2) a tour of the PI facility in Hyannis; (3) discussions with insiders to the transactions; (4) Canno; and (5) his investigation of the reputation and background of PI and persons involved in the transactions.

Becker possessed no education, special qualifications, or professional skills in plastics engineering, plastics recycling,

or plastics materials.  Despite his lack of knowledge regarding the product, the target market, and the technical aspects at the heart of the Plastics Recycling transactions, Becker did not hire an expert in plastics materials or plastics recycling, or recommend that his clients do so.  He retained the law firm Rabin & Silverman to assist him with the legal aspects of organizing the SAB recycling partnerships.  In addition, one of the partners, DiGiovanna, advised Becker with respect to his disclosure obligations under the applicable securities laws.

Becker testified that DiGiovanna told him that he had fulfilled the fiduciary responsibilities associated with his position and function as a general partner.  A specialist in securities and corporate law, DiGiovanna testified that "Becker wanted to be covered from the securities law standpoint in terms of full disclosure."  Digiovanna explained that the extent of his advice encompassed compliance with securities laws.  At trial DiGiovanna could not recall specific discussions he had with Becker or whether Becker or anyone else at Becker Co. visited PI. DiGiovanna was not responsible for, and did not get, independent verification of any of the representations in the offering materials.  He never visited PI or saw a Sentinel EPE recycler.

DiGiovanna did not have any education or experience in engineering, plastics materials, or plastics recycling.

The only independent person having any connection with the plastics industry with whom Becker spoke was Canno. A client of Becker Co., Canno was a part owner and the production manager of Equitable Bag Co., a manufacturer of paper and plastic bags. Becker spoke to Canno about the recyclers and PI, but did not hire or pay him for any advice. Canno did not visit PI's plant in Hyannis, see or test a Sentinel EPE recycler, or see or test any of the output from a Sentinel EPE recycler or the recycled resin pellets after they were further processed by PI. According to Becker, Canno endorsed the Plastics Recycling transactions after reviewing the offering materials. Asked at trial if Canno had done any type of comparables analysis, Becker replied, "I don't know what Mr. Canno did."

Becker visited the PI plant in Hyannis, toured the facility, viewed a Sentinel EPE recycler in operation, and saw products that were produced from recycled plastic. During his visit he was told that the recycler was unique and that it was the only machine of its type. In fact, the Sentinel EPE recycler was not unique; instead, several machines capable of densifying low density materials were already on the market. Other plastics

recycling machines available during 1981 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Becker was also told that PI had put an enormous amount of research and development--10 to 12 years worth--into the creation and production of the Sentinel EPE recycler. When he asked to see the cost records for some kind of independent verification, however, his request was denied. Becker was informed that such information was proprietary and secret,[20] and that he would just have to take PI's representations as true. Becker decided to accept PI's representations after speaking with Miller (the corporate counsel to PI), Canno (who had never been to PI's plant or seen a Sentinel EPE recycler), and a surrogate judge from Rhode Island who did business in the Boston-Cape Cod area (and who had no experience in engineering or plastics materials). Becker testified that he was allowed to see PI's internal

---

[20] Although PI claimed that all of its information was a trade secret, and that it never obtained patents on any of its machines, PI had in fact obtained numerous patents prior to the recycling transactions and had also applied for a trademark for the Sentinel recyclers.

accounting controls regarding the allocation of royalty payments and PI's recordkeeping system in general.  In Provizer v. Commissioner, supra, this Court found that "PI had no cost accounting system or records."

Becker confirmed at trial that he relied on the offering materials and discussions with PI personnel to establish the value and purported uniqueness of the recyclers.  Becker testified that he relied upon the reports of Ulanoff and Burstein contained in the offering materials, despite the fact:  (1) Ulanoff's report did not contain any hard data to support his opinion; (2) Ulanoff was not an economics or plastics expert; (3) Becker did not know whether Burstein was an engineer; and (4) Burstein was a client of Miller's and was not an independent expert.  In addition, as we found in the Provizer case, "Ulanoff and Burstein each owned an interest in more than one partnership which owned Sentinel Recyclers as part of the Plastics Recycling Program."[21]  Provizer v. Commissioner, supra.

---

[21]     Spears stipulated that Ulanoff owned a 1.27-percent interest in Plymouth Equipment Associates and a 4.37-percent interest in Taylor Recycling Associates, both partnerships that leased Sentinel Recyclers.  Spears also stipulated that Burstein owns a 2.605-percent interest in Empire Associates and a 5.82-percent interest in Jefferson Recycling Associates, also partnerships that leased Sentinel Recyclers.

Becker explained at trial that when he evaluates prospective investments for clients, he focuses on the economics of the transaction and investigates whether there is a need or market for the product or service. With respect to the Partnership transactions, the records indicate that Becker overlooked several red flags regarding the economic viability and market for the Sentinel EPE recyclers. The offering memoranda for the Partnership transactions warned that there was no established market for the Sentinel EPE recyclers. Becker never saw any marketing plans for selling the pellets or leasing the recyclers. He accepted representations by PI personnel that they would be marketing the recyclers to clients and that there was a sufficient base of end-users for the machines, yet he never saw PI's client list. At the time of the closing of the Partnerships, Becker did not know who the end-users were or whether there were any end-users actually committed to the transaction.

Becker purportedly checked the price of the pellets by reading trade journals of the plastics industry. However, he did not use those same journals to investigate the recyclers' purported value or to see whether there were any advertisements for comparable machines. In concluding that the Partnerships

would be economically profitable, Becker made two assumptions that he concedes were unsupported by any hard data: (1) That there was a market for the pellets; and (2) that market demand for them would increase.

### d. Conclusion Concerning Petitioners' Alleged Reliance on Becker

Petitioners in these cases are very well educated and highly accomplished, sophisticated investors. Without question they possessed the intellect, skills, experience, and resources to have the viability of the Plastics Recycling transactions thoroughly investigated.

Petitioners claim to have relied upon Becker for the bona fides and viability of the Partnership transactions. Yet Becker's expertise was in taxation, not plastics materials or plastics recycling, and Spears and Farrell knew this. Moreover, Becker indicated that he was careful not to mislead any of his clients regarding the particulars of his limited investigation. As he put it: "I don't recall saying to a client I did due diligence * * * [Rather,] I told [my clients] precisely what I had done to investigate or analyze the transaction. I didn't just say I did due diligence, and leave it open for them to define what I might or might not have done."

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases, and that circumstance was clearly reflected in the offering memoranda. Certainly Becker recognized the nature of the tax benefits and, given their education and investment experience, petitioners should have recognized it as well. Yet neither petitioners nor Becker verified the purported value of the Sentinel EPE recycler. Becker confirmed at trial that he relied on PI for the value of the Sentinel EPE recyclers. Investors as sophisticated as petitioners either learned or should have learned the source and shortcomings of Becker's valuation information when he reported to them and "precisely" disclosed "what [he] had done to investigate or analyze the transaction." Accordingly, we hold that petitioners did not in good faith or reasonably rely on Becker as an expert or a qualified professional working in the area of his expertise to establish the fair market value of the Sentinel EPE recycler and the viability or bona fides of the Partnership transactions. Becker never assumed such responsibility, and he fully described the particulars of his investigation, taking care not to mischaracterize it as "due diligence."

In the end, petitioners and Becker relied upon Miller and other PI personnel for the value of the Sentinel EPE recycler and the economic viability of the Partnership transactions. See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion." Becker did not possess any education, special qualifications, or professional skills in plastics materials or plastics recycling. A taxpayer may rely upon his adviser's expertise (in these cases accounting and tax advice), but it is not reasonable or prudent to rely upon a tax adviser regarding matters outside his field of expertise or with respect to facts that he does not verify. See Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. sub nom. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329; Rogers v. Commissioner, T.C. Memo. 1990-619.

### 3. The Private Offering Memoranda

In addition to purportedly relying on Becker, petitioners maintain that they reasonably relied upon the offering memoranda and the tax opinion letter appended thereto. However, petitioners' testimony and actions indicate that they did not thoroughly review or study all of the information set out in the

offering memoranda and that they ultimately did not place a great deal of reliance, if any, on the representations therein.

On their face, the Partnership transactions should have raised serious questions in the minds of ordinarily prudent investors. The offering memoranda included numerous caveats and warnings with respect to the Partnerships, including: (1) The substantial likelihood of audit by the IRS and a likely challenge of the purported value of the recyclers; (2) the general partner's lack of experience in marketing recycling or similar equipment; (3) the lack of an established market for the recyclers; and (4) uncertainties regarding the market prices for virgin resin and the possibility that recycled pellets would not be as marketable as virgin pellets. In addition, the offering memoranda noted a number of conflicts of interest, including Miller's interest in F & G and his legal representation of Burstein, PI, and Raymond Grant, who was the sole shareholder of ECI.

A careful consideration of the materials in the respective offering memoranda, especially the discussions of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d 1383, 1386

(9th Cir. 1988), affg. <u>Dister v. Commissioner</u>, T.C. Memo. 1987-217.  According to the offering memoranda, for each $50,000 investor, the projected first-year tax benefits were investment tax credits in excess of $82,500 plus deductions in excess of $40,000.[22]  For Farrell's $25,000 investment in SAB Reclamation in 1982,[23] he and his wife Clotilde claimed an operating loss in the amount of $20,050 and investment tax and business energy credits in the amount of $41,856.  As a result of Spears' $25,000 investment in SAB Recycling, he and his wife Joan claimed an operating loss in the amount of $19,870 and investment tax and business energy credits totaling $41,320.

The direct reductions claimed on Spears' and Farrell's Federal income tax returns, from the investment tax credits alone, ranged from 165 to 167 percent of their cash investments, respectively, without taking into consideration any rebated commissions and advance royalty payments.  Therefore, after adjustments of withholding, estimated tax, or final payment, like the taxpayers in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners [Spears and Farrell] never had any money in the * * * [Partnership

---

[22]   The projected tax benefits for the Partnerships in the first year of the investment, for each $50,000 investor, were as follows:  Investment tax credits of $82,639 plus deductions of $40,037 for SAB Recycling in 1982, and investment tax credits of $83,712 and deductions of $40,234 for SAB Reclamation in 1982.

[23]   The amounts set forth above as invested by petitioners are the gross amounts invested, unreduced by any rebated commissions or advance royalty payments.

transactions]."  In view of the disproportionately large tax benefits claimed on petitioners' 1982 Federal income tax returns, relative to the dollar amounts invested, further investigation of the Partnership transactions clearly was required.  A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true.  McCrary v. Commissioner, 92 T.C. 827, 850 (1989).  A reasonably prudent person would not conclude without substantial investigation that the Government was providing tax benefits so disproportionate to the taxpayers' investment of their own capital.

Petitioners' arguments are not supported by the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996). In Osterhout, on which petitioners rely, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained respondent's imposition of the negligence additions to tax with respect to one of the partners therein.[24]  The taxpayer had relied in part upon a tax opinion contained in the

_____

[24]     Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases.  The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax provided for under sec. 6653(a), inter alia.  Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the parties.

offering materials.  The Court of Appeals for the Ninth Circuit reversed our imposition of the negligence additions to tax. However, the prefaces to the offering memoranda for the Partnerships herein warned prospective investors that the tax opinion letter was not in final form, and was prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with the Partnership.  The tax opinion letter was addressed solely to the general partner and contained the following opening disclaimer:

> This opinion is provided to you for your individual guidance.  We expect that prospective investors will rely upon their own professional advisors with respect to all tax issues arising in connection with an investment in the Partnership and the operations thereof.  We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that the purpose in distributing it is to assist your offerees' and their tax advisors in making their own analysis and not to permit any prospective investor to rely upon our advice in this matter.  [Emphasis added.]

Accordingly, both the offering memoranda and the tax opinion letter expressly and unambiguously indicated that prospective investors such as petitioners were not to rely upon the tax opinion letter.  See Collins v. Commissioner, supra.  The limited, technical opinion of tax counsel in these cases was not designed as advice upon which taxpayers might rely and the opinion of counsel itself so states.

Moreover, the records indicate that petitioners did not thoroughly review the offering memoranda, which included the tax opinion letter, or place much reliance on them. Spears testified that he relied more on Becker than the offering materials. Farrell described private placement memoranda as "the legal documentation necessary to cover one in case things go bad" and finds that they do not "lead * * * to an understanding of the merits of [an] investment". He also testified that he does not place undue influence on them and has never made a decision to invest based upon one. Petitioners will not be relieved of the negligence additions to tax based upon the Ninth Circuit Court of Appeals' partial reversal in the Balboa Energy Fund 1981 case.

### 4. Miscellaneous

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler having a value of $1,162,666. In support of this position, Spears submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information

available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by Spears. The projected valuations therein were based on inadequate information,[25] research, and investigation, and were subsequently rejected and discredited by their author. Respondent likewise rejected the reports and considered them unsatisfactory for any purpose; and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, Spears' counsel obtained copies of these reports and urges that they support the reasonableness of the values reported on Spears' 1982 joint return. Not surprisingly, Spears' counsel did not call Carmagnola to testify in these cases,[26] but preferred instead to

_____

[25]    In one preliminary report, Carmagnola states that he has "a serious concern of actual profit" from a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. (Emphasis in original.) Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

[26]    Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.

rely solely upon his preliminary, ill-founded valuation estimates.  The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court of Appeals in the Provizer case, where we held the taxpayers negligent.  Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence.  Spears will not be relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Spears also placed into the record of his case several documents, ostensibly submitted as evidence that he monitored his investments in the Plastics Recycling transactions.  These included unaudited, unreviewed financial statements of SAB Leasing Associates for 1982, a 1982 update regarding placement of the recyclers, financial statements of SAB Associates for 1979 and 1980, and introductory information regarding SAB Leasing Associates.  Spears did not testify or otherwise indicate that he ever examined these documents.  At trial, Spears could not recall having received and read a confidential memorandum, addressed to all limited partners, that discussed SAB Associates' change of business from tax straddle investments to leasing plastics recyclers.  Spears could not recall the conversations he had with Becker; he did not know how many SAB recycling partnerships Becker was involved in; and he did not know whether there was an established market for the Sentinel EPE recyclers.  The offering

materials clearly stated that there was no established market for the recyclers. We decline to infer from these documents or the balance of the record that Spears actively monitored his investments in the Plastics Recycling transactions.

Petitioners' reliance on Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993) is misplaced. The taxpayer in Mollen was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership that invested in the production, marketing and distribution of medical educational video tapes. District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable. Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters. Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable." Id.; see Zfass v. Commissioner, T.C. Memo. 1996-167.

The records in these cases show that neither petitioners nor Becker had any formal education, expertise, or experience in plastics materials or plastics recycling. None of them had any personal insight or industry know-how in plastics recycling that

would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable.  Becker relied heavily upon representations by insiders to the Plastics Recycling transactions, and neither he nor petitioners hired any independent experts in the field of plastic materials or plastics recycling.  Becker did discuss the transactions with Canno, who apparently was familiar with the plastics industry, but Canno was not hired by Becker to investigate PI and the Sentinel EPE recycler, never saw a Sentinel EPE recycler, and never prepared any kind of formal, written analysis of the venture.  The facts of these cases are distinctly different from those in the Mollen case.  Therefore, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

### 5.  Conclusion As to Negligence

Under the circumstances of these cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their respective Federal income tax returns.  Petitioners did not reasonably rely upon the offering memoranda or the materials appended thereto.  Becker did not possess any education, special qualifications, or professional skills in the plastics or recycling industries; he did not employ any experts in those fields; and he disclosed to petitioners the limits of his investigation.  See Goldman v. Commissioner, 39 F.3d at 408; Marine v. Commissioner, 92 T.C.

958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988).  We conclude that petitioners were negligent in claiming the deductions and credits with respect to the Partnerships on their Federal income tax returns for 1982.  We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a)(1) and (2).  Respondent is sustained on this issue.

## B.  Section 6659 - Valuation Overstatement

In the notice of deficiency, respondent determined that William and Joan Spears were liable for the section 6659 addition to tax on the portion of their underpayment attributable to valuation overstatement.  Spears has the burden of proving that respondent's determination is erroneous.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

In an amendment to answer, respondent asserted that Vincent and Clotilde Farrell were liable for the section 6659 addition to tax on the portion of their underpayment attributable to valuation overstatement.  Because this addition to tax was raised for the first time in respondent's amendment to answer, respondent bears the burden of proof on this issue.  Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994).

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is

attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioners claimed tax benefits, including an investment tax credit and a business energy credit, based on purported values of $1,162,666 for each Sentinel EPE recycler. Petitioners each concede that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatements, petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the tax benefits claimed with respect to the Partnerships.

Both petitioners argue that respondent erroneously failed to waive the section 6659 addition to tax. Farrell also expressly contends that the section 6659 addition to tax is inapplicable because: (1) Disallowance of the claimed tax benefits was attributable to other than a valuation overstatement; and (2) concession of the claimed tax benefits precludes imposition of the section 6659 additions to tax.

1.  The Grounds for Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements.  See McCrary v. Commissioner, supra; Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements.  Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable.  See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Farrell argues that the disallowance of the claimed tax benefits was not "attributable to" a valuation overstatement. According to Farrell, the tax benefits were disallowed because

the Partnership transactions lacked economic substance, not because of any valuation overstatements. It follows, he reasons, that because the "attributable to" language of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to the deficiency. Farrell cites the following cases to support this argument: Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, supra; Todd v. Commissioner, supra.

This argument rests on the mistaken premise that our holding that the Partnership transactions lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the Partnership transactions lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in these cases; (2) the underpayments of tax; and (3) our finding that the Partnership transactions lacked economic substance.

Moreover, a virtually identical argument was rejected in Gilman v. Commissioner, supra, by the Second Circuit Court of Appeals, the court to which appeal in these cases lies. See

Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970) affd. 445 F.2d 985 (10th Cir. 1971). In the Gilman case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance. The taxpayers therein, citing Heasley v. Commissioner, supra, and Todd v. Commissioner, supra, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation. The Second Circuit Court of Appeals sustained imposition of the section 6659 addition to tax because overvaluation of the computer equipment contributed directly to this Court's earlier conclusion that the transaction lacked economic substance and was a sham. Gilman v. Commissioner, supra at 151. In addition, the Second Circuit Court of Appeals agreed with this Court and the Eighth Circuit Court of Appeals that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'" Gilman v. Commissioner, supra at 151 (quoting Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without

published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993)).

Farrell's reliance on Gainer v. Commissioner, supra, McCrary v. Commissioner, 92 T.C. 827 (1989), and Todd v. Commissioner, supra, is misplaced. In contrast to the consolidated cases herein, it was found that a valuation overstatement did not contribute to an underpayment of taxes in any of the cited cases. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. Although property was overvalued in each of those cases, the overvaluations were not the ground on which the taxpayers' liability was sustained. In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item." McCrary v. Commissioner, supra at 859. Each of petitioners' cases present just such a "different situation": overvaluation of the recyclers was integral to and inseparable from the claimed tax benefits and our finding that the Partnership transactions lacked economic substance.[27]

---

[27] To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an
(continued...)

## 2.  Concession of the Deficiency

Farrell argues that his concession of the deficiency precludes imposition of the section 6659 addition to tax. Farrell contends that his concession renders any inquiry into the grounds for such deficiency moot.  Absent such inquiry, Farrell argues that it cannot be known if the underpayments were attributable to a valuation overstatement or other discrepancy. According to Farrell, "once the taxpayer concedes the underlying adjustment, there is no basis upon which the necessary correlation between understatement in tax and overvaluation can be established."  In support of this line of reasoning, Farrell relies heavily upon Heasley v. Commissioner, supra, and McCrary v. Commissioner, supra.  Although Spears did not expressly make this argument, we include the Spears case in our discussion because he similarly conceded disallowance of the tax benefits claimed by him and his wife.

---

[27](...continued)
application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable.  To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit have disagreed.  See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1989-684:  "The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement."

Petitioners' open-ended concessions do not obviate our finding that the Partnership transactions lacked economic substance due to overvaluation of the recyclers. This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties." See McCrary v. Commissioner, supra at 854. The value of the Sentinel EPE recycler was established in Provizer v. Commissioner, T.C. Memo. 1992-177, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by the Partnerships, petitioners claimed deductions and credits that resulted in underpayments of tax, and we held that the Partnership transactions lacked economic substance. Regardless of petitioners' concessions, in these cases the underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. Id. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v. Commissioner, 893 F.2d at 228; Irom v. Commissioner, 866 F.2d

545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, supra.

In the present cases, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the investment tax credits related to anything other than a valuation overstatement.  To the contrary, petitioners each stipulated substantially the same facts concerning the Partnership transactions as we found in Provizer v. Commissioner, supra.  In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers.  The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance.  Similarly, the records in these cases plainly show that the overvaluation of the recyclers was integral to and was the core of our holding that the underlying transactions here were shams and lacked economic substance.

Petitioners' reliance on McCrary v. Commissioner, supra, is misplaced.  In that case the taxpayers conceded disentitlement to their claimed tax benefits and the section 6659 additions to tax were held inapplicable.  However, the concessions of the claimed tax benefits, in and of themselves, did not preclude imposition of the section 6659 additions to tax.  In McCrary v.

Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was a license and not a lease.  In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the Sentinel EPE recyclers.  We hold that petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[28]

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000.  Our holding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance.  Petitioners stipulated that the Partnership transactions were similar to the Clearwater transaction described in the Provizer case, and that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.  Given those concessions, and the fact that the records here plainly show that the overvaluation of the recyclers was the underlying reason for disallowance of the claimed tax benefits, we conclude that the deficiencies were attributable to overvaluation of the Sentinel EPE recyclers.

[28]  Petitioners' reliance on Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate.  That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession.  Moreover, see supra note 27, to the effect that the Court of Appeals for the Second Circuit and this Court have not followed the Heasley opinion with respect to the application of sec. 6659.

3.  Section 6659(e)

Both petitioners argue that respondent erroneously failed to waive the section 6659 additions to tax.  Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith.  Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.  Krause v. Commissioner, 99 T.C. 132, 179 (1992).

Petitioners urge that they relied on Becker and the offering memorandum in deciding on the valuation claimed on their tax returns.  Petitioners contend that such reliance was reasonable, and, therefore, respondent should have waived the section 6659 additions to tax.[29]  However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioners' purported reliance on Becker and the offering materials was not reasonable.

Becker possessed no special qualifications or professional skills in the recycling or plastics industries.  He relied exclusively on PI and its personnel and on the offering materials

---

[29]    In his posttrial brief, Farrell referenced the reports prepared by Carmagnola in support of the reasonableness of the claimed valuation.  For reasons discussed supra, we consider the reports prepared by Carmagnola to be unreliable and of no consequence.

as to the value and purported uniqueness of the machines.  The offering memoranda for the Partnerships warned that the value placed on the recyclers would probably be challenged by the IRS as being in excess of fair market value.  Nonetheless, Becker never hired or consulted any plastics engineering or technical experts with respect to the Plastics Recycling transactions.  Becker did speak to his client Canno, who apparently had some knowledge of the plastics industry, but the substance of Canno's purported comments is doubtful and he had only minimal information about the transaction.  Petitioners' reliance on Becker and the offering materials was not reasonable.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23.  However, the facts in the Mauerman case are distinctly different from the facts of these cases.  In Mauerman, the Tenth Circuit Court of Appeals held that the Commissioner had abused her discretion for not waiving a section 6661 addition to tax.  Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith.  Sec. 6661(c).  The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized.  The advice relied upon by the taxpayer in Mauerman

was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In these cases, particularly with respect to valuation, petitioners relied upon advice that was outside the scope of expertise and experience of their advisers. Consequently, we consider petitioners' reliance on the <u>Mauerman</u> case inapplicable.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in the Partnerships. In these cases respondent properly could find that petitioners' reliance on Becker and the offering materials was unreasonable. The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position. We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion. Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

<u>Decisions will be entered under Rule 155</u>.